**Michael MOSS, et al., Plaintiffs,**

**v.**

**UNITED STATES SECRET SERVICE, Department of Homeland Security, et al., Defendants.**

**Case No. CV 06–3045–CL.**

United States District Court,
D. Oregon,
Medford Division.

Oct. 29, 2010.

Arthur B. Spitzer, American Civil Liberties Union of the National Capital Area, Washington, DC, Ralph J. Temple, Ashland, OR, Steven M. Wilker, James K. Hein, Paul W. Conable, Tonkon Torp LLP, Portland, OR, for Plaintiffs.

Brant S. Levine, U.S. Department of Justice, Jeremy S. Brumbelow Washington, DC, Robert E. Franz, Jr., Law Office of Robert E. Franz, Jr., Springfield, OR, Roger J. Dehoog, Oregon Department of Justice, Kevin H. Kono, Robert D. Newell, Davis Wright Tremaine, LLP, Portland, OR, for Defendants.

## ORDER

PANNER, District Judge.

Magistrate Judge Mark D. Clarke has filed a Report and Recommendation, and the matter is now before this court. *See* 28 U.S.C. § 636(b)(1)(B), Fed.R.Civ.P. 72(b). When either party objects to any portion of a Magistrate Judge's Findings and Recommendation, the district court reviews that portion of the Magistrate Judge's report *de novo*. 28 U.S.C. § 636(b)(1)(C); *McDonnell Douglas Corp. v. Commodore Bus. Mach., Inc.*, 656 F.2d 1309, 1313 (9th Cir.1981). Here, defendants have filed timely objections, so I have reviewed the file *de novo*.

## DISCUSSION

On interlocutory appeal, the Ninth Circuit reversed and remanded this court's rulings on defendants' motions to dismiss plaintiffs' first amended complaint. *Moss v. U.S. Secret Serv.*, 572 F.3d 962 (9th Cir.2009). The Ninth Circuit ruled that plaintiffs "should be granted leave to amend their complaint so that they have the opportunity to comply with [*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) and *Ashcroft v. Iqbal*, —— U.S. ——, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ]." *Moss*, 572 F.3d at 965.

After remand, plaintiffs have filed a second amended complaint. Defendants move to dismiss based on qualified immunity and failure to state a claim. Judge

Clarke's comprehensive Report and Recommendation concludes that defendants' motions should be denied in part.

I agree with Judge Clarke that the second amended complaint meets the stricter pleading standards imposed by *Twombly* and *Iqbal* as to plaintiffs' claims for First Amendment violations against the federal defendants; for First and Fourth Amendment violations and common law claims against the County defendants; for Fourth Amendment violations against the State defendants; and for Fourth Amendment violations and common law claims against the City defendants. R & R at 71.

I also agree with Judge Clarke that defendants have not shown, at least at this stage of the litigation, that they are entitled to qualified immunity. Defendants cite *Dunn v. Castro*, 621 F.3d 1196 (9th Cir.2010), as supplemental authority for their argument that Judge Clarke defined the First Amendment right at issue here too broadly. The *Dunn* opinion, which concerned an incarcerated father's right to receive visits from his children, does not undercut Judge Clarke's analysis of the qualified immunity issue.

Judge Clarke recommends dismissing plaintiffs' remaining claims. For the reasons stated in Judge Clarke's prior Report and Recommendation, I agree that plaintiffs' remaining claims should be dismissed. Accordingly, I ADOPT the current Report and Recommendation in its entirety.

## CONCLUSION

Magistrate Judge Clarke's Report and Recommendation (# 178) is adopted. De-fendants' motions (# 154, # 156, # 162, and # 164) are granted in part and denied in part as set forth in the Report and Recommendation.

IT IS SO ORDERED.

## REPORT & RECOMMENDATION

CLARKE, United States Magistrate Judge:

Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 and *Bivens v. Six Unknown Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) alleging claims for violations of the First, Fourth, Fifth, and Fourteenth Amendments, the Oregon Constitution, and Oregon common law by Defendants. They seek compensatory and punitive damages and injunctive and declaratory relief from Defendants for alleged unconstitutional, unlawful, and tortious actions against Plaintiffs and Plaintiff Class, arising out of and related to Defendants' disruption of Plaintiffs' lawful assembly and protest demonstration in Jacksonville, Oregon, on October 14, 2004.

Named Plaintiffs [1] include Michael Moss, Lesley Adams, Beth Wilcox, Richard Royer, Lee Frances Torelle, Mischelle Elkovich, Anna Vine, and the Jackson County Pacific Green Party.

Named Defendants include United States Secret Service of the Department of Homeland Security ("Defendant Secret Service"), Mark Sullivan, Tim Wood, Rob Savage, John Doe 1, David Towe, City of Jacksonville, Ron Ruecker, Timothy F. McLain, Ran die Martz, Eric Rodriguez,

---

1. Plaintiffs seek class certification (SAC ¶¶ 31–34), but the court declines to address this issue in the present report and recommendation. Federal Rule of Civil Procedure 23(c)(1)(A) explains that the court must determine whether to certify the action as a class action "at an early practicable time" after a suit has been filed. However, "in some cases, it may be appropriate in the interest of judicial economy to resolve a motion for summary judgment or a motion to dismiss prior to a ruling on class certification." *Wright v. Schock*, 742 F.2d 541, 545–46 (9th Cir.1984).

Mike Winters, Jackson County, and John Does 2–20, Municipal Doe Defendants.

For the purposes of this report and recommendation, the defendants will be referred to by the following:

"Secret Service Defendants" or "Federal Defendants": Defendant Secret Service and individual defendants Sullivan, Basham, Wood, Savage, and John Doe 1.

"State Defendants": Defendants Ruecker, McLain, Martz, and Rodriguez.

"Local Defendants": City of Jacksonville, Jackson County, individual defendants Towe, Winters, John Does 2–20, and Municipal Doe Defendants.

Plaintiffs filed their second amended complaint ("SAC") on October 15, 2009.[2] Before the court are Defendants' motions to dismiss and motion for summary judgment. The motions are granted as to all claims previously dismissed by this court on June 8, 2007[3] to include all injunctive and declaratory relief claims, claims for relief for violations of the Fifth and Fourteenth Amendment, and claims for relief under the Oregon Constitution. (Report & Recommendation, Dkt. No. 107 ("2007 R & R") 35.) As to specific motions before the court:

Federal Defendants' motion to dismiss (# 164) is denied in part and granted in part. Motion is denied as to Plaintiffs' claims for damages from individual federal defendants for violation of the First Amendment rights. Consistent with the 2007 R & R, motion is granted to dismiss claims against Basham for lack of personal jurisdiction, and the *Bivens* claim against federal defendants for violations of Fourth Amendment rights.

State Defendants' motion to dismiss (# 162) is granted in part and denied in part. Motion is granted to dismiss claims against Ron Ruecker and Eric Rodriguez in their individual capacities for violations of their First Amendment right. Motion is denied as to claims for violations of Fourth Amendment.

Jackson County Defendants' motion to dismiss (# 154) is granted, consistent with the 2007 R & R as to injunctive and declaratory relief and relief under the Oregon Constitution.

City of Jacksonville Defendants' motion to for summary judgment (# 156) is construed as a motion to dismiss as to Plaintiffs' § 1983 claims.[4] The motion is granted as claims for violation of Plaintiffs' First Amendment rights and denied as to claims for violations of Fourth Amendment rights. City Defendants' motion for summary judgment as to claims under Oregon common law is premature and held in abeyance pending the close of discovery.

## I. Procedural History

### A. First Amended Complaint

Plaintiffs filed their complaint on July 6, 2006, and filed their first amended complaint ("FAC") on September 26, 2006, al-

---

2. Plaintiffs first brought this action in July 2006. Defendants, collectively, filed several motions to dismiss and a motion for summary judgment. The court granted in part and denied in part the motions. Federal Defendants filed an interlocutory appeal with the Ninth Circuit Court of Appeals. The Ninth Circuit reversed the court's decision but granted Plaintiffs leave to amend. Plaintiffs amended their complaint, supplementing facts, re-pleading claims previously dismissed, and pleading new claims.

3. Court has carefully reviewed its June 2007 decision and sees no reason to disturb those rulings.

4. City Defendants also filed a motion for summary judgment to the FAC. (Dkt. No. 56.) On April 27, 2007, the court held that motion in abeyance pending the close of discovery. (Dkt. No. 103.)

leging claims for violations of the First, Fourth, Fifth, and Fourteen Amendments, as well as state law claims for violations of the Oregon Constitution, and Oregon common law claims of assault and battery, false imprisonment, and negligence. Plaintiffs sought declaratory and injunctive relief, compensatory and punitive damages, interest, attorneys fees, and costs. (Dkt. Nos. 1 and 21.) Defendants collectively filed motions to dismiss and a motion for summary judgment. (Dkt. Nos. 52, 53, 56, 62, 68, and 72.) The court determined that Defendants' summary judgment motions should be held in abeyance pending the close of discovery and considered only the motions to dismiss. (Dkt. No. 103.)

After oral argument, Magistrate Judge Mark Clarke recommended that these motions be granted in part and denied in part.

> Specifically, the court finds that: 1) plaintiffs' allegations fail to establish plaintiffs have standing to seek prospective relief; 2) plaintiffs' substantive due process claims are barred as they are covered by the First and Fourth Amendments; 3) plaintiffs cannot seek damages for violations of the Oregon Constitution; 4) to the extent that plaintiffs are suing state officials in their official capacity for retrospective declaratory relief, plaintiffs' claims are barred by the Eleventh Amendment; 5) plaintiffs have failed to establish personal jurisdiction over defendant Basham; 6) plaintiffs' complaint fails to state a Fourth Amendment claim against defendants Wood and Savage; 7) taking plaintiffs' allegations as true, plaintiffs have pleaded a violation of clearly established First Amendment law by the federal defendants.

(2007 R & R, 2.) District Court Judge Owen Panner adopted the recommendation. (Dkt. No. 130.)

Claims remaining included: [5]

(1) against Federal Defendants: the *Bivens* claim for Federal Defendants' violation of Plaintiffs' First Amendment Rights and for attorneys fees under § 1988.

(2) against State, County and City Defendants: § 1983 claims for violations of their First and Fourth Amendment Rights and § 1988 claim for attorney fees.

(3) against City and County Defendants: § 1983 claims for violations of their First and Fourth Amendment Rights, § 1988 claim for attorneys fees, claims for punitive damages, and claims for compensatory damages for violations of Oregon common law for assault and battery, false imprisonment, and negligence.

Federal Defendants filed an interlocutory appeal, appealing the district court's denial of its motion to dismiss claims against them and the denial of their defense of qualified immunity. The Ninth Circuit found for the Federal Defendants: "the factual content contained within the complaint does not allow us to reasonably infer that the [Federal Defendants] ordered the relocation of Plaintiffs' demonstration because of its anti-Bush message." The court concluded that the claim did not satisfy the requirements of *Twombly* and *Iqbal. Moss v. U.S. Secret Service,* 572 F.3d 962, 972 (9th Cir.2009). The Ninth Circuit reversed the district court's decision but granted Plaintiffs leave to amend their complaint, giving them the opportunity to comply with *Bell Atlantic v. Twom-*

---

5. This court respectfully disagrees with the Ninth Circuit's summary of its R & R, which concluded: "The magistrate then issued a final [R & R] recommending dismissal of all of Plaintiffs' claims against the state and local defendants." *Moss v. U.S. Secret Service,* 572 F.3d 962, 967 (9th Cir.2009).

*bly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) and *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). *Moss,* 572 F.3d at 964.[6] "They may be able to amend their complaint to include facts that will state a plausible claim, and thus the interests of justice would be served by granting them a chance to do so." *Id.* at 975. The case was reversed and remanded on September 8, 2009. (Dkt. No. 147.)

## B. Second Amended Complaint

Plaintiffs filed their second amended complaint ("SAC"; Dkt. No. 151) on October 15, 2009 seeking four claims for relief. In filing their SAC, Plaintiffs repled claims the district court previously dismissed but were not appealed, though the Ninth Circuit's permission to replead did not encompass previously dismissed claims. Plaintiffs explained, "Although certain of Plaintiffs' claims were dismissed by the court on the Defendants' motions, those claims are restated here so as to preserve them for appeal." (SAC ¶ 2.) The court is not revisiting its previous decisions on dismissed claims, and the previous ruling remains the same.

Claims in the SAC are summarized as follows:

(1) *First Claim Against Secret Service Defendants:*

Individual Secret Service Defendants, except Defendant Sullivan, are liable in their individual or personal capacities to Plaintiffs for compensatory damages under *Bivens* for violations of First, Fourth, and Fifth Amendment rights. Plaintiffs seek punitive damages and declaratory relief under *Bivens* as well as declaratory and supplemental injunctive relief under 5

U.S.C. § 702 against all Defendants in their official capacities and all person acting in the official capacities as their agents.

(2) *Second Claim Against State, Jackson County and City of Jacksonville Defendants:*

Defendants, except State Defendant McLain and Martz, are liable in their individual and personal capacities for compensatory damages under 42 U.S.C. § 1983 and for attorneys fees under 42 U.S.C. § 1988 for violations of their First, Fourth, Fifth, and Fourteenth Amendment rights. Plaintiffs seek punitive damages and declaratory relief. Plaintiffs assert they are entitled to injunctive relief from all Defendants in their official capacities and all person acting in the official capacities as their agents.

(3) *Third Claim Against Jackson County and City of Jacksonville Defendants*

Plaintiffs seek compensatory damages for violations of their rights under the Oregon Constitution. They also seek declaratory and injunctive relief and attorneys fees pursuant to *Armaria v. Kitzhaber,* 959 O, 2d 49 (Or. 1998). (SAC ¶¶ 112–115.)

(4) *Fourth Claim Against Jackson County and City of Jacksonville Defendants*

Plaintiffs seek compensatory damages under Oregon common law for assault and battery, false imprisonment, and negligence. (SAC ¶¶ 116–118.)

In the SAC, Plaintiffs pled new facts and asserted new claims (1) against Secret Service Defendants, Sullivan, Basham, Wood, and Savange in their individual or personal capacities for declaratory relief

---

**6.** Federal Defendants also sought an interlocutory appeal on the district court's deferral of their alternative motion for summary judgment. The Ninth Circuit concluded, "The

attempt is misguided and, if it were to succeed, would deny Plaintiffs a fair opportunity to litigate the merits of their claim." *Moss,* 572 F.3d at 972.

under *Bivens* for violations of their Constitutional rights under the First, Fourth, and Fifth Amendment (SAC ¶ 105) and (2) against state and local defendants Towe, Ruecker, Rodriguez, McLain, Martz, and Winters in their individual and personal capacities under 42 U.S.C. § 1983 for violations of their constitutional rights under the First, Fourth, and Fifth Amendments. (SAC ¶ 108.)

Defendants filed several motions to dismiss claims against them under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. City Defendants filed a motion for summary judgment on all claims against them. Motions include

(1) Federal Defendants Secret Service, Mark Sullivan, Ralph Basham, Tim Wood, and Rob Savage's Motion to Dismiss (# 165)

(2) State Defendants Ron Ruecker, Eric Rodriguez, Tim McLain, and Ran die Martz's Motion to Dismiss (# 162)

(3) Defendants Jackson County and Mike Winters' Motion to Dismiss (# 154),

(4) Defendants City of Jacksonville and David Towe's Motion for Summary Judgment (# 156)

The court heard oral argument on May 12, 2010.

## II. Background

On October 14, 2004, former President George W. Bush made a campaign appearance in Central Point, Oregon. The President was scheduled to spend the evening at the Honeymoon Cottage in Jacksonville, Oregon. Plaintiffs, who had learned of the President's plan to visit Jacksonville, organized a demonstration to their express opposition to the President and his policies. Plaintiffs assert they communicated their plans with Defendant Towe of the City of Jacksonville and Defendant Winters of Jackson County. (SAC ¶¶ 40–41.) Around 6:00 p.m., Plaintiffs, consisting of approximately 200 to 300 anti-Bush dem-

onstrators, assembled on California Street between Third and Fourth Streets, where the Jacksonville Inn (the "Inn") was located. The Honeymoon Cottage was approximately two blocks south of the Inn.

A similarly sized group of pro-Bush demonstrators assembled adjacent to the anti-Bush demonstrators, beginning at the western curb of Third Street and extending west along California Street. They were separated from the anti-Bush demonstrators by the 37-foot width of Third Street. (SAC ¶¶ 45–48.)

En route to Jacksonville, the President decided to dine at the Inn. At approximately 7:00 p.m., both pro-Bush and anti-Bush demonstrators learned of the President's change of plans. Demonstrators in both groups clustered to the north side of California Street. Plaintiffs assert that both groups had equal access to the President upon his arrival and were positioned to have equal access during his departure, had they remained in the same locations. (SAC ¶ 48.)

Prior to the President's arrival, state and local law enforcement officers cleared the alleyway behind the Inn to provide back entrance access and began restricting the movements of some of the demonstrators outside the Inn. Plaintiffs allege State and Local Defendants' law enforcement officers, dressed in riot gear, cleared the Third Street alley to the patio dining area and directly behind the Inn. Plaintiffs assert these actions were taken at the request of a Secret Service agent. Law enforcement officers blocked Third Street, including both the sidewalk north of California Street and the California Street alley running along the east side of the Inn. Law enforcement officers were stationed at the entrance of the California Street alley to prevent any unauthorized persons from entering the alley. (SAC ¶¶ 48–49.)

The President arrived at approximately 7:15 p.m., entering the Inn's open air dining patio through a back entrance. Also present at the Inn were dozens of hotel guests and diners who were permitted to remain inside the Inn without undergoing any form of security screening. In the upstairs dining area of the Inn was a group of approximately 30 persons affiliated with a medical educational group. These individuals were not screened. Plaintiffs allege that some members were able to view the President from inside the Inn. For instance, some found an unguarded door leading into the patio dining area from where they could open the door and view the President from a distance of approximately 15 feet. (SAC ¶ 52.)

At approximately 7:30 p.m., Secret Service agents directed local and state law enforcement officers to clear California Street between Third and Fourth Streets and move all persons in that area to the east side of Fourth Street and subsequently to the east side of Fifth Street. (SAC ¶ 53.) Federal Defendants claim that the reason for the Secret Services' request to move the persons in that area was because they did not want any one within handgun or explosive range of the President.[7] Plaintiffs assert that this security rationale is false because there was no significant security difference between the two groups—the pro-Bush demonstrators and the anti-Bush demonstrators. (SAC ¶ 55.)

At approximately 7:45 p.m. a line of police officers, including State and Local Defendants, in riot gear formed across California Street, facing the anti-Bush demonstrators. These officers made amplified announcements stating that the anti-Bush assembly was now unlawful and ordered the anti-Bush demonstrators to move. Plaintiffs allege that State and Local Defendants and law enforcement of-ficers forcefully moved the anti-Bush demonstrators from their location without ascertaining whether the demonstrators heard or understood the announcements. In some instances, Plaintiffs allege, these officers were violent, striking some individuals with clubs and firing pepper spray bullets at them. (SAC ¶ 61.) Plaintiffs further allege that once they were moved beyond Fourth Street to Fifth Street, they were separated into two groups and law enforcement officers encircled each group, preventing some demonstrators from leaving the area. Some families were separated in the process. (SAC ¶ 61.)

Pro–Bush demonstrators were permitted to remain on the northwest and southwest corners of Third and California Streets. Plaintiffs allege that the anti-Bush group was targeted by the Secret Service and these demonstrators were cleared from the area:

> even though they were much farther from the President than the unscreened diners, hotel guests, and other visitors, including the assembled medical group, inside the Inn, and even though they had no greater access to the President than the pro-Bush demonstrators. In fact, having moved the anti-Bush demonstrators two blocks east the Defendant Secret Service agents left the pro-Bush demonstrators with unimpeded access to the President along the route to the Honeymoon Cottage, demonstrating that the purported reason for moving the anti-Bush demonstrators was false.

(SAC ¶ 57.) Plaintiffs allege that neither the pro-Bush demonstrators on California Street nor the unscreened diners, hotel guests, and other visitors at the Inn were moved or screened. (SAC ¶ 58.)

---

**7.** The Secret Service's explanation of protecting the President from those within handgun or explosive range will hereinafter be referred to as the "security rationale."

Plaintiffs assert that Defendants Towe, Rodriguez, Winters and other individual defendants "personally directed and approved of the action of the police against Plaintiffs ... and personally directed and approved of permitting the pro-Bush demonstrators and unscreened diners, guests, and visitors ... to remain in the vicinity undisturbed and unrestricted." (SAC ¶ 96.) Further, Plaintiffs explain,

> The Police Defendants' actions and actions of the police officers in using overwhelming and excessive force, including the use of officers clad in riot gear, against unarmed, law-abiding peaceful demonstrators exercising their core First Amendment rights of speech and assembly on public sidewalks were the custom, policy or practice of the State of Oregon and Defendants City of Jacksonville and Jackson County and Municipal Does respectively, or were established as such by the individual Police Defendants in taking those actions. The individual Police Defendants had the final decision-making authority and responsibility for establishing the policies of their respective employers. The individual Police Defendants' decision to order and implement the aforesaid police actions constituted the official policy of their respective public employees.

(SAC ¶ 97.)

Plaintiffs allege that this is one of several examples of the Secret Service's policy of discriminating against First Amendment expression, in its cooperation with the Advance Team under President Bush. Plaintiffs allege,

> Since the early 1960s, each American President has employed an Advance Team to work together with the Secret Service to manage the twin goals of protecting the President and providing him access to the public in his public appearances and travels. Each President has established different policies in

the balance between these two goals. The Secret Service has a long history of going beyond security measures necessary to protect the President, and manipulating its security function to protect Presidents from First Amendment-protected expressions of opposition by individuals and groups. This has required the courts periodically to examine and declare invalid, unlawful, or excessive, so-called security measures for which the Secret Service could not show a reasonable basis.

(SAC ¶¶ 63–64.) As further evidence of their claim, Plaintiffs point to the coordination of the Secret Service with the Advance Team and reference the "Presidential Advance Manual," dated 2002, attaching a redacted copy to the complaint.

Plaintiffs allege, "the White House under President George W. Bush, more than any prior Presidency, sought to prevent or minimize the President's exposure to dissent or opposition during his public appearances and travels, while at the same time maximizing—within the demands of reasonable security—his exposure to supporters and to the public in general." (SAC ¶ 67.) Plaintiffs allege that the Secret Service Defendants and the Advance Team under President Bush's administration worked closely together to "concoct, manipulate, and gerrymander false security rationales for the exclusion or distancing of opposition, dissent, or protest expressive activity from proximity to the President, while minimizing the distancing of the public in general and supporters." (SAC ¶ 69.)

Further, Plaintiffs allege that the Secret Service had an unwritten policy and practice to work with the White House to eliminate dissent and protest from presidential appearances. The policy was put into effect on October 14, 2004:

there was no time for the Advance Team to take action to stifle and suppress the protest. Instead, the President's team relied on the Secret Service to do so by directing and requesting local authorities to clear [streets] where protesters opposing President Bush were congregated, while leaving undisturbed the nearby pro-Bush demonstrators, as well as the unscreened diners, hotel guests, including the assembled medical group, who were inside the Inn.

(SAC ¶ 70.)

Plaintiffs also allege that written guidelines, instructions and rules for handling demonstrations, promulgated or caused to be promulgated by the Secret Service and Defendant Basham are a sham, "designed to conceal and immunize from judicial review the actual policy and practice" as evidenced in the events on October 14, 2004. (SAC ¶ 71.) Plaintiffs allege this policy imposed greater restrictions on Plaintiffs and violated the principles of the First Amendment that prohibit viewpoint discrimination as related to pro-Bush demonstrators, content discrimination of political assemblage as related to the medical group, and content or viewpoint discrimination as related to individual guests and diners at the Inn. (SAC ¶ 73.) They allege the Secret Service's actions do not comport with normal, lawful Secret Service security measures. (SAC ¶ 78.)

Plaintiffs allege that the removal of the anti-Bush demonstrators occurred only after the President entered the dining area and heard chants of the anti-Bush demonstrators. (SAC ¶ 77.) They assert the proposed security rationale of protecting the President from handgun or explosive range was false and the actions taken were really a part of the Bush Administration's official policy of shielding the President from seeing or hearing anti-Bush demonstrators and preventing anti-Bush demonstrators from reaching the President with their message. Plaintiffs point out that the anti-Bush demonstrators posed no greater risk and, they argue, posed less risk of assaulting the President with a handgun or explosive, than the guests, diners, and the assembled medical group inside the Inn. (SAC ¶¶ 80–81.)

Finally, Plaintiffs include a list of published reports that, they allege, show how the Secret Service has engaged in actions against anti-government expressive activity. These include President Bush's appearances at the following:

(1) March 27, 2001 at Western Michigan University in Kalamazoo, Michigan

(2) August 23, 2002 in Stockton, California

(3) January 22, 2003 in St. Louis, Missouri

(4) September 2, 2002 in Neville Island, Pennsylvania

(5) December 2002 in Philadelphia, Pennsylvania

(6) May 2003 in Omaha, Nebraska

(7) June 17, 2003 in Washington, D.C.

(8) July 2003 in Philadelphia, Pennsylvania

(9) July 4, 2004 in Charleston, West Virginia

(10) July 13, 2004 in Duluth, Minnesota

(11) August 26, 2004 in Farmington, New Mexico

(12) September 9, 2004 in Colmar, Pennsylvania (SAC ¶ 82.)

### III. Legal Standards of 12(b)(6) Motion to Dismiss

Defendants filed various dispositive motions, arguing the Plaintiffs have not pled facts sufficient to state a claim for relief.

To survive dismissal for failure to state a claim pursuant to Rule 12(b)(6), a complaint must contain more than a "formulaic recitation of the elements of a

cause of action;" specifically, it must contain factual allegations sufficient to "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). To raise a right to relief above the speculative level, "[t]he pleading must contain something more ... than ... a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Id.,* quoting 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1216, pp. 235–236 (3d ed. 2004); *see also* Fed.R.Civ.P. 8(a). Instead, the plaintiff must plead affirmative factual content, as opposed to any merely conclusory recitation that the elements of a claim have been satisfied, that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). "In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. United States Secret Serv.,* 572 F.3d 962, 970 (9th Cir.2009), citing *Iqbal,* 129 S.Ct. at·1949.

"In ruling on a 12(b)(6) motion, a court may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Swartz v. KPMG LLP,* 476 F.3d 756, 763 (9th Cir.2007). In considering a motion to dismiss, this court accepts all of the allegations in the complaint as true and construes them in the light most favorable to the plaintiff. *See Kahle v. Gonzales,* 474 F.3d 665, 667 (9th Cir.2007), Moreover, the court "presume[s] that general allegations embrace those specific facts that are necessary to support the claim." *Nat'l Org. for Women v. Scheidler,* 510 U.S. 249, 256, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994), *quoting Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The court need not, however, accept legal conclusions "cast in the form of factual allegations." *Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981).

Recent decisions from the U.S. Supreme Court have clarified the pleading requirements under Rule 8. In 2007 the Court's decision in *Bell Atlantic Corporation v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), began the most recent discussion, and their decision in *Iqbal* clarified the standards further. The Ninth Circuit carefully studied both decisions when it evaluated Defendants' interlocutory appeal related to the FAC. This court incorporates the Ninth Circuit's analysis, in part, here.

*Twombly* concerned a conspiracy claim under Section 1 of the Sherman Act. 550 U.S. at 548–49, 127 S.Ct. 1955. The plaintiffs had alleged facts suggesting that the defendant companies had engaged in parallel market conduct, but the plaintiffs did not allege specific facts indicating the existence of an actual agreement in restraint of trade, which was an element of the plaintiffs' cause of action. *See id.* at 553–57, 127 S.Ct. 1955. In reversing the Second Circuit's denial of the defendants' Rule 12(b)(6) motion, the Court held that an antitrust plaintiff must plead a set of facts "plausibly suggesting (not merely consistent with)" a Sherman Act violation to survive a motion to dismiss. *Id.* at 557, 127 S.Ct. 1955.

In its *Twombly* decision, the Court cautioned that it was not outright overruling *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), the foundational "notice pleading" case construing Federal Rule of Civil Procedure 8(a)(2), but it explained that *Conley's* oft-cited maxim that "a complaint should not be dismissed for failure to state a claim unless it appears

beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," *Conley*, 355 U.S. at 45–46, 78 S.Ct. 99, read literally, set the bar too low. *See Twombly*, 550 U.S. at 561–62, 127 S.Ct. 1955. "[A]fter puzzling the profession for 50 years," the Court concluded, *Conley's* "no set of facts" refrain "is best forgotten as an incomplete, negative gloss on an accepted pleading standard." *Id.* at 563, 127 S.Ct. 1955.

At the same time, the Court appeared to signal that *Twombly* should not be read as effecting a sea change in the law of pleadings. *Twombly* cited *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), for the proposition that pleadings should not be found deficient even if it is apparent "that a recovery is very remote and unlikely." 550 U.S. at 556, 127 S.Ct. 1955. To add to the confusion, in *Erickson v. Pardus*, 551 U.S. 89, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007), decided shortly after *Twombly*, the Court noted that "[s]pecific facts are not necessary" for pleadings to satisfy Rule 8(a)(2). *Id.* at 93, 127 S.Ct. 2197 (citing *Twombly* (quoting *Conley* ) for that proposition).

Much confusion accompanied the lower courts' initial engagement with *Twombly*. *Compare Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 n. 5 (9th Cir.2008) (stating that, at least for the purposes of antitrust cases, *Twombly* abrogated the usual "notice pleading" rule); *and ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 58 (1st Cir.2008) (concluding that *Twombly* provided Rule 12(b)(6) with "more heft"); *with Aktieselskabet AF 21. November 2001 v. Fame Jeans*, 525 F.3d 8, 15 & n. 3 (D.C.Cir.2008) (noting disagreement among the circuits about *Twombly's* import and concluding that the case "leaves the long-standing fundamentals of notice pleading intact").

The Court addressed some of the lower courts' lingering questions in *Iqbal*, a *Bi-*

*vens* action alleging (among other claims) First Amendment violations. The Court elaborated on *Twombly's* applicability in the context of a motion to dismiss based on qualified immunity.

The plaintiff in *Iqbal* a Pakistani Muslim man, was arrested and detained in the days following the attacks of September 11, 2001. 129 S.Ct. at 1942. He alleged that former Attorney General of the United States John Ashcroft and Federal Bureau of Investigation ("FBI") Director Robert Mueller, by specifically authorizing an unconstitutional detention policy, subjected him to "harsh conditions of confinement on account of his race, religion, or national origin." *Id.*

The Court first explained that "bare assertions ... amount[ing] to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim," for the purposes of ruling on a motion to dismiss, are not entitled to an assumption of truth. *Id.* at 1951 (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). Such allegations are not to be discounted because they are "unrealistic or nonsensical," but rather because they do nothing more than state a legal conclusion-even if that conclusion is cast in the form of a factual allegation. *Id.* Thus, in *Iqbal*, the Court assigned no weight to the plaintiff's conclusory allegation that former Attorney General Ashcroft and FBI Director Mueller knowingly and willfully subjected him to harsh conditions of confinement "solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest." *Id.* (quoting plaintiff's complaint).

After dispatching with the complaint's conclusory allegations, the Court elaborated on *Twombly's* plausibility standard. "A claim has facial plausibility," the Court explained, "when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." 129 S.Ct. at 1949. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief' " *Id.* (quoting *Twombly,* 550 U.S. at 557, 127 S.Ct. 1955).

■ In sum, for a complaint to survive a motion to dismiss, the non-conclusory "factual content" and reasonable inferences from that content must be plausibly suggestive of a claim entitling the plaintiff to relief. *Id.*

## IV. Declaratory or Injunctive Relief Claims

This court dismissed prospective declaratory and injunctive relief claims of the FAC because "plaintiffs lack standing, plaintiffs' claim is not ripe for review, and plaintiffs have an adequate remedy at law." (2007 R & R 35.) Plaintiffs repled all claims in their SAC, including claims previously dismissed by this court, and pled new claims for declaratory relief against Federal Defendants in their official capacities.

Federal Defendants argue that because the court has previously dismissed injunctive and declaratory relief claims for lack of standing, Plaintiffs' new claim for individual-capacity equitable relief is "untenable." They argue, "Plaintiffs *also* lack standing to seek equitable relief from … Savage and Wood in their individual capacities (it follows, as well, that Plaintiffs' individual capacity, equitable relief claims are unripe, just as their previously asserted equitable relief claims were held by this Court to be)." (Fed. Defs.' Mem. 34.)

■ Though Plaintiffs have re-pled and supplemented their claims, the allegations that support claims for declaratory and injunctive relief remain materially the same. The court's previous ruling dismissed these claims, and this decision is not disturbed.

Plaintiffs' allegations are insufficient to support a claim for equitable relief. The threat of future injury to plaintiffs is based on an extended chain of speculative contingencies and some day intentions which are insufficient to support standing. *Anoushiravani v. Fishel,* 2004 WL 1630240 at *4 (D.Or.). The allegations in plaintiffs' complaint fail to establish that plaintiffs have standing to seek prospective relief. Although plaintiffs allege a pattern and practice of conduct by the Secret Service, plaintiffs have not alleged that they have been injured either before or after the October 14 demonstration or that they plan to demonstrate at any particular time or place in the future. Unlike the pattern and practice cases cited by plaintiffs, plaintiffs have not shown that they have been personally injured by this alleged pattern and practice, other than at the October 14 demonstration. The lack of such allegations distinguishes this case from *Marbet v. City of Portland,* 2003 WL 23540258 (D.Or.) and other pattern and practice cases relied upon by plaintiffs. The lack of such allegations cannot be resolved by class certification.

. . .

Plaintiffs subjective feelings of inhibition to participate in future demonstrations are not sufficient. *Laird v. Tatum,* 408 U.S. 1, 13–14 [92 S.Ct. 2318, 33 L.Ed.2d 154] (1972). Plaintiffs have not pled a real and immediate threat. The court finds both *Elend v. Sun Dome, Inc.,* 370 F.Supp.2d 1206 (M.D.Fla.2005) and *Acorn v. City of Philadelphia,* 2004

WL 1012693 (E.D.Pa.) persuasive and directly on point. As in those cases, plaintiffs' allegations are insufficient to support standing to seek prospective relief.

The issuance of equitable relief also requires the likelihood of substantial and immediate irreparable harm and an inadequate remedy at law. *O'Shea v. Littleton,* 414 U.S. 488, 502 [94 S.Ct. 669, 38 L.Ed.2d 674] (1974). This requirement cannot be met where the threat of injury is conjectural and hypothetical, and there are adequate remedies at law. *Id.* The allegations in plaintiffs' complaint do not show that they have been previously subjected to the same type of conduct either before and after this incident. This is the only time they have been subjected to this type of treatment. Plaintiffs allegations demonstrate that plaintiffs cannot meet the requirement of showing any real or immediate threat that plaintiffs will be wronged again. *See Hodgers–Durgin v. de la Vina,* 199 F.3d 1037, 1042–1044 (9th Cir.1999). In addition, plaintiffs have a claim for damages, and, therefore, have an adequate remedy at law. *City of Los Angeles v. Lyons,* 461 U.S. 95, 109, 113 [103 S.Ct. 1660, 75 L.Ed.2d 675] (1983). (2007 R & R 33–35.) Accordingly, any new claims for declaratory or injunctive relief are dismissed for the same reasons.

## V. First Amendment Claims

 Plaintiffs allege that all Defendants violated their First Amendment rights and seek relief under *Bivens* against Federal Defendants and under § 1983 against State, Local, and City Defendants.[8]

### A. Federal Defendants' Motion to Dismiss First Amendment Claims Is Denied

██ Federal Defendants filed their motion to dismiss Plaintiffs' claims against Defendants Wood, Savage, and John Doe 1 for violation of their First Amendment rights.[9] To survive the motion, Plaintiffs must plead a plausible *Bivens* claim. Plaintiffs must allege a violation of their constitutional rights by agents acting under the color of federal law. *Morgan v. U.S.,* 323 F.3d 776, 780 (2003) (citing *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)).

 A violation of First Amendment rights may result from content discrimination or viewpoint discrimination. " 'Content discrimination' occurs when the government 'chooses the subjects' that may be [publicly] discussed, while 'viewpoint discrimination' occurs when the government prohibits 'speech by particular speakers,' thereby suppressing a particular view about a subject." *Giebel v. Sylvester,*

---

8. Section 1983 provides a civil action against *persons* who violate an individual's constitutional rights. Federal employees sued in their individual capacities may be sued for damages as well as declaratory or injunctive relief. *Hafer v. Melo,* 502 U.S. 21, 31, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). Individuals sued in their official capacities may only be sued for declaratory or injunctive relief. *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Further, a state is not a person for the purposes of this section, but case law, however, treats municipal and local governments as "persons" under the statute and subject to damages and declaratory or injunctive relief. *Monell v. Dept. of Social Services of New York,* 436 U.S. 658, 701, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Because all injunctive relief claims were dismissed in the 2007 R & R, Plaintiffs' remaining First Amendment claims under § 1983 are for damages against Defendants Rodriguez, Ruecker, Towe, Winters, Jackson County, and the City of Jacksonville.

9. Plaintiffs include Defendant Basham in their *Bivens* claim; however, the court determined in 2007 that it did not have personal jurisdiction.

244 F.3d 1182, 1188 (9th Cir.2001) (alterations in the original) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 59, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (Brennan, J., dissenting)). " '[V]iewpoint discrimination' occurs when the government prohibits 'speech by particular speakers,' thereby suppressing a particular view about a subject." *Giebel v. Sylvester*, 244 F.3d 1182, 1188 (9th Cir. 2001) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 59, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (Brennan, J., dissenting)); *c.f. R.A.V. v. City of St. Paul*, 505 U.S. 377, 391, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). The Supreme Court made it clear that government suppression of speech, based on the speaker's motivating ideology, opinion, or perspective is impermissible. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys."); *Mahoney v. Babbitt*, 105 F.3d 1452, 1456 (D.C.Cir.1997) (holding that the First Amendment does not permit the federal government to bar ideological opponents from peacefully protesting on the sidewalks of Pennsylvania Avenue during President Clinton's second Inaugural Parade).

This court follows the *Iqbal* methodological approach to assess the adequacy of Plaintiffs' complaint, as the Ninth Circuit did when it evaluated the FAC on interlocutory appeal.

A court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Iqbal*, 129 S.Ct. at 1950.

### 1. Summary of Ninth Circuit's Application of *Iqbal* to FAC

Because the Ninth Circuit identified areas in the FAC that it found to be deficient of the pleading the standards, regarding the *Bivens* claim, this court looks specifically at those areas and how they were sufficiently re-pled in the SAC. *See Moss*, 572 F.3d at 970–71.

First, the Ninth Circuit identified three pleadings that were not entitled to the assumption of truth, being that they were no more than legal conclusions and not supported by factual allegations. *See Iqbal*, 129 S.Ct. at 1950. These pleadings included allegations that (1) Federal Defendants acted on an impermissible motive in relocating Plaintiffs; (2) Federal Defendants ordered the relocation, acting in conformity with an officially authorized *sub rosa* Secret Service policy of suppressing speech critical of the President; and (3) there was systematic viewpoint discrimination at the highest levels of the Secret Service. *Moss*, 572 F.3d at 970.

Second, the Ninth Circuit determined that the remaining factual allegations did not plausibly suggest a claim for relief. It concluded, "[t]o prevail on their *Bivens* claim against individual Agents, Plaintiffs must establish that the Agents ordered the relocation of their demonstration *because of* not merely in spite of, the demonstration's anti-Bush message." *Moss*, 572 F.3d at 970.

The court identified two remaining non-conclusory factual allegations. These allegations were offered to show Federal Defendants' disparate treatment towards anti-Bush demonstrators and thus evidence of discriminatory intent. However,

the court concluded the following remaining allegations were not enough: (1) agents ordered the relocation of anti-Bush demonstrators but left a similarly situated pro-Bush demonstration undisturbed and (2) diners and guests inside the Inn were not subjected to the security screening or asked to leave the premises, despite their close proximity to the President. *Moss,* 572 F.3d at 971. The court explained, "the factual content contained within the complaint does not allow us to reasonably infer that the Agents ordered the relocation of Plaintiffs' demonstration because of its anti-Bush message, and therefore it fails to satisfy *Twombly* and *Iqbal.*" *Id.* at 972.

### 2. Plaintiffs Have Pled a Plausible *Bivens* First Amendment Claim

This court now evaluates the plausibility of Plaintiffs' SAC *Bivens* claim for a violation of their First Amendment rights by the Federal Defendants acting in their individual capacities.

### a. Plaintiffs Have Successfully Repled Non–Conclusory Allegations

The Ninth Circuit summed up its findings discounting specific factual allegations:

> The bald allegation of impermissible motive on the Agents' part, standing alone, is conclusory and is therefore not entitled to an assumption of truth. The same is true of Plaintiffs' allegation that, in ordering the relocation of their demonstration, the Agents acted in conformity with an officially authorized *sub rosa* Secret Service policy of suppressing speech critical of the President. The allegation of systematic viewpoint discrimination at the highest levels of the Secret Service, without *any* factual content to bolster it, is just the sort of conclusory allegation that the *Iqbal* Court deemed inadequate, and thus does nothing to enhance the plausibility of

Plaintiffs' viewpoint discrimination claim against the Agents.

*Moss,* 572 F.3d at 970.

Plaintiffs have amended and supplemented their factual allegations. *See Id.* at 972, 975. The "legal conclusions," as identified by the Ninth Circuit in FAC, have now been supported by factual allegations and are thus entitled to an assumption of truth at this stage of the pleadings.

### i. Impermissible Motive

Plaintiffs allege the Federal Defendants acted with an impermissible motive when they relocated the anti-Bush demonstrators. They suggest that the Federal Defendants' motive in moving the anti-Bush demonstrators was not based on their security rationale but based on an impermissible motive of suppressing anti-Bush demonstrators' speech, thereby violating their First Amendment rights. (SAC ¶¶ 55, 57.) Given the additional facts alleged, this allegation is no longer a "bald legal conclusion."

 The basis of Plaintiffs' allegation of impermissible motive is that the security rationale was only applied to the anti-Bush demonstrators. Defendants asserted that they relocated the anti-Bush group because they did not want anyone within handgun or explosive range of the President. (SAC ¶ 54.) From this assertion, it follows that anyone who was within handgun or explosive range of the President could expect to be relocated, screened, or at least subject to some other form of security.

On the scene that day, there were many who were in handgun or explosive range of the President, including pro-Bush and anti-Bush demonstrators and certainly guests and diners also at the Inn. All groups had the same notice of the President's arrival at the Inn. Both groups of demonstrators were non-violent, and inter-

actions between these two groups were "courteous and jovial." (SAC ¶ 46.)

Plaintiffs assert that there was no significant security difference between the pro-Bush and anti-Bush groups prior to the President's arrival. (SAC ¶ 54.) Further, the only difference between Plaintiffs and the other groups was the anti-Bush demonstrators' speech. (SAC ¶ 80.)

Plaintiffs also assert that the President was protected from public view, to include both groups of demonstrators, by a wooden fence, six feet in height. (SAC ¶ 51.) Plaintiffs allege the Secret Service secured the alley on California Street with law enforcement officers in riot gear. Neither group of demonstrators had line of sight to the patio where the President was dining, and both groups were blocked by the buildings along California Street. (SAC ¶¶ 49, 50.) Plaintiffs also assert that the diners at the Inn posed a greater security threat to the President because they were simply closer to the President than the groups of demonstrators. (SAC ¶ 57.)

The Secret Service and other law enforcement officers, however, relocated only the pro-Bush demonstrators two block from their original location, presumably to move them outside the security perimeter and outside the handgun or explosive range. Plaintiffs argue this reason of security, however was false and was only given to cover up the impermissible motive of restricting the anti-Bush demonstrators' speech. They point out that the relocation occurred only after anti-Bush chants and slogan were heard within the patio. (SAC ¶ 53.)

The new facts alleged highlight that those permitted to stay within the security perimeter or within handgun or explosive range were those who either had no expressed view of the President or his policies or who had a positive view. (SAC ¶ 57.) For instance, the guests at the Inn were within handgun or explosive range of the President and yet were subjected to no enhanced security. Further, the pro-Bush demonstrators were able to cheer the President on his motorcade route after his meal, and some guests and diners were able to view the President while he was on the patio from an unlocked door. (SAC ¶¶ 55–56, 62.) Plaintiffs argue,

> [i]f preventing people from being within handgun or explosive range of the President "[h]ad been the true reason for the ... [order to move the anti-Bush demonstrators], the Defendant Secret Service agents would have requested or directed that the pro-Bush demonstrators at the corner of Third and California be moved further to the west so that they would not be in range of the President as he traveled from the Inn to the Honeymoon Cottage."

(Pls.' Mem. in Opp'n 13, citing SAC ¶ 55.)

Plaintiffs allege the anti-Bush demonstrators were targeted because of their speech. They argue this is plausibly alleged and supported when the court considers that all people within the handgun or explosive range of the President posed the same threat but only those who expressed an anti-Bush message were relocated further from the Inn and further from the President's post-dinner motorcade route.

The court agrees. The allegation that Federal Defendants acted with an impermissible motive is not a legal conclusion and is entitled to assumption of truth for the purposes of this motion.

### ii. *Sub Rosa* Policy

Plaintiffs assert that the Federal Defendants were operating on a *sub rosa* policy that suppressed the speech of individuals who opposed the President or his policies. In analyzing the FAC, the Ninth Circuit found that there was no factual support for this allegation. Plaintiffs have since as-

serted additional facts supporting their allegation that there was a *sub rosa* policy.

Plaintiffs generally state that the policy and practices of the Secret Service on October 14, 2004, and at other instances over the previous two years violated three principles of the First Amendment: (1) imposition of greater restrictions on Plaintiffs than on pro-Bush demonstrators outside the Inn, violating the principle of viewpoint discrimination; (2) imposition of greater restrictions on Plaintiffs than on the medical group assembled inside the Inn, violating the principle of content discrimination against political assemblage as compared to non-political assemblage; and (3) imposition of greater restrictions on Plaintiffs than on individual diners and guests inside the Inn, violating the principles that prohibit content discrimination or viewpoint discrimination against persons solely because they are assembled to express a political or opposing view. (SAC ¶ 73.)

Plaintiffs allege specifically, "[t]he Secret Service's actual but unwritten policy and practice was to work with the White House under President Bush to eliminate dissent and protest from presidential appearances." (SAC ¶ 70.) "[V]iewpoint discrimination by the Secret Service in connection with President Bush was the official policy of the White House." (SAC ¶ 68.) Plaintiffs allege that the Presidential Advance Manual, put forth by the White House Advance Team under the Bush Administration, presents sufficient evidence of the Secret Service's unofficial policy:

> The White House under President George W. Bush, more than any prior Presidency, sought to prevent or minimize the President's exposure to dissent or opposition during his public appearances and travels, while at the same time maximizing—within the demands of reasonable security—his exposure to

supporters and to the public in general. This policy was set out in some detail in the official "Presidential Advance Manual," dated October 2002, instructing the White House Advance Team on how to keep protestors out of the President's vicinity and sight.... The unredacted excerpts [of the Presidential Advance Manual] include discussions about how to deal with protestors, how to disrupt protests, and how to insure the protesters are kept out of sight or hearing of the President and the media. These facts demonstrate not just a pattern and practice, but an official White House policy of seeking to stifle dissent.

(SAC ¶¶ 67–68.) Plaintiffs allege that this practice and policy is evidenced by the Secret Services's actions over the preceding two years against anti-government expressive activity. (*See* SAC ¶ 82.)

Regarding the specific event on October 14, 2004, Plaintiffs allege,

> when the President's plans changed ..., there was no time for the Advance Team to take action to stifle and suppress the protest. Instead the President's team relied on the Secret Service to do so by directing and requesting local authorities to clear both sides of California Street between Third and Fourth Streets, and subsequently between Third and Fifth Streets, where protesters opposing President Bush were congregated, while leaving undisturbed the nearby pro-Bush demonstrators, as well as the unscreened diners, hotel guests, and other visitors, including the assembled medical group, who were inside the Inn.

(SAC ¶ 70.) Plaintiffs argue that the Secret Service's actions "were consistent with and taken pursuant to the actual but unwritten policy and practice of the Secret Service to shield the President from seeing or hearing anti-Bush demonstrators and to

prevent anti-Bush demonstrators from reaching the President with their message." (SAC ¶ 81.)

The allegation of a *sub rosa* policy is supported with the excerpts of the Advance Manual. Though this manual was not written for or by the Secret Service, Plaintiffs allege Federal Defendants were implementing this policy when they moved only anti-Bush demonstrators from the location. "[T]he Secret Service worked closely with the Advance Team to achieve the goal set out in the Presidential Advance Manual, and to concoct, manipulate, and gerrymander false security rationales for the exclusion of distancing of opposition, dissent, or protest expressive activity from proximity to the President, while minimizing the distancing of the public in general and supporters." (SAC ¶ 69.)

Specifically, the Advance Manual instructs the Advance Team in the "Preparing for Demonstrators" Section:

> There are several ways the advance person can prepare a site to minimize demonstrators. First, as always, work with the Secret Service and have them ask the local police department to designate a protest area where demonstrators can be placed, preferably not in view of the event site or motorcade route.

(SAC, Ex. B, 9.) Under "Handling Demonstrators", it explains,

> Once a group of demonstrators has been identified, the Advance person must decide what action to take. If it is determined that the media will not see or hear them and that they pose no potential disruption to the event, they can be ignored. On the other hand, if the group is carrying signs, trying to shout down the President, or has potential to cause some greater disruption to the event, action needs to be taken *immediately* to minimize the demonstrator's effect. . . . If the demonstrators appear to be a security threat notify the Secret

Service immediately. If demonstrators appear likely to cause only a political disruption, it is the Advance person's responsibility to take appropriate action. (SAC, Ex. B, 10.)

As Plaintiffs point out, Federal Defendants' actions mirrored the instructions in this Advance Manual: only the anti-Bush demonstrators were moved, thereby "minimizing" their threat. Plaintiffs' allegation of a *sub rosa* policy and the Secret Service's involvement in training and directing agents on this policy is not conclusory.

The Federal Defendants, however, counter that the Ninth Circuit previously considered and consequently rejected Plaintiffs' claim of a *sub rosa* policy when it evaluated the sufficiency of the FAC. (Federal Defs.' Mem. in Supp. of Mot. to Dismiss ("Fed. Defs.' Mem.") 15–26.) The court disagrees with this interpretation of the Ninth Circuit decision. The Ninth Circuit found that Plaintiffs' allegation of an officially authorized *sub rosa* Secret Service policy was conclusory and needed some factual allegations if it were to be considered in the complaint's sufficiency evaluation. *Moss*, 572 F.3d at 970. The Ninth Circuit did not specifically place limitations on what allegations Plaintiffs could re-plead in their First Amendment claim. *Id.* at 974–75.

Federal Defendants also object to Plaintiffs' allegations of the dozen previous instances of the Secret Service's policy of suppressing First Amendment rights. "[T]hese other alleged incidents are entirely dissimilar to the one at issue here, and, in any event, none of them is said to have involved Defendants Savage and Wood." They argue that Wood and Savage cannot be responsible for policies allegedly promulgated by the federal agency that employs them or for the implementation of policies by fellow agents around the country. (Fed. Defs.' Mem. 14–15.)

Federal Defendants want the allegations of previous instances of viewpoint discrimination disregarded, arguing they do not support a *Bivens* claim. They explain,

> Just as those Defendants cannot be subjected to suit for the actions of others ... so too they are not responsible for claimed "policies" allegedly promulgated by the federal agency that employs them, or for the alleged implementation of such policies by fellow agents around the country.... Indeed, the Supreme Court has squarely held that a *Bivens* action such as this is not the proper means to challenge the alleged policies of federal agencies.

(Fed. Defs.' Mem. 14–15.)

Federal Defendants are correct; the Supreme Court has clearly declined to extend *Bivens* actions to claims against a federal agency. *See F.D.I.C. v. Meyer*, 510 U.S. 471, 486, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994). However, as the Ninth Circuit noted, the purpose of the allegation of a *sub rosa* policy is not to support a *Bivens* claim against the Agency but to enhance the plausibility of Plaintiffs' viewpoint discrimination claim on the whole. *See Moss*, 572 F.3d at 970.[10]

The court is not convinced by Federal Defendants' argument. Plaintiffs alleged that there was an unwritten policy implemented by the Federal Defendants to shield the President from anti-Bush demonstrations and messages. In support of this allegation, they have submitted excerpts of the Advance Manual describing measures to shield the President and have alleged in what ways these instructions were implemented in Jacksonville and in other areas of the country over the preced-ing two years. What the Ninth Circuit found as a conclusory allegation in the FAC, has been repled in the SAC to be non-conclusory.

### iii. Systematic Viewpoint Discrimination

The Ninth Circuit saw no merit in the FAC's assertion of systematic viewpoint discrimination. The court noted, "the allegation of systematic viewpoint discrimination at the highest level of the Secret Service, without *any* factual content to bolster it, is just the sort of conclusory allegation that the *Iqbal* Court deemed inadequate." *Moss*, 572 F.3d at 970.

Factual support has been added to the SAC to bolster this allegation. Plaintiffs added support with allegations based on the Advance Manual, the Advance Manual itself attached to the complaint, and the alleged similar instances of speech suppression across the country over the preceding two years. Plaintiffs' systematic viewpoint discrimination allegation is supported by factual content and thus is worthy of assumption of truth. This is enough, at this stage of the litigation, to raise the conclusory allegation in the FAC to one in the SAC that is entitled to assumption of truth.

### b. Non–Conclusory Factual Allegations Suggest a Plausible *Bivens* First Amendment Claim

Viewing all the factual allegations entitled to assumption of truth in the SAC, including those noted above, Plaintiffs have pled a plausible claim. For pleading purposes, the court can reasonably infer a First Amendment violation based on these alleged facts.

---

**10.** Additionally, this allegation may have a dual purpose to support Plaintiffs' claims against defendants in their official capacity, though the court previously dismissed these claims. For example, Plaintiffs are seeking declaratory and supplemental injunctive relief under 5 U.S.C. § 702 against Secret Service Defendants in their official capacities and all persons acting in the official capacities, though the court declines to revisit its prior ruling. (SAC ¶ 105.)

#### i. Disparate Treatment as Related to Pro–Bush Demonstrators

Plaintiffs have plausibly alleged disparate treatment to support their claim of discriminatory intent. Plaintiffs asserted that the Secret Service's security rationale was false, arguing it was a sham, designed for the purpose to relocate the Plaintiffs. As proof, they point out that anti-Bush demonstrators were treated differently than the other groups. They allege that they were the only ones subject to the security measures and support this with their allegation that others also within handgun or explosive range were not relocated or subjected to any security measures. Individuals who were within this proximity to the President included both pro- and anti-Bush demonstrators as well as guests and diners at the Inn. Further, both groups of demonstrators were blocked from the President by buildings along California Street. (SAC ¶ 50.) However, it was only the anti-Bush demonstrators who were moved or subjected to any kind of security measures. Plaintiffs argue this shows that they were treated differently because of their views.

Plaintiffs allege several new facts in the SAC to remedy what the Ninth Circuit found deficient in their FAC. The Ninth Circuit found that there was no plausible disparate treatment claim based only the relocation of one block from Third to Fourth Street.

> The complaint alleges that the Agents instructed state and local police to move "all persons" between Third and Fourth Streets to the east side of Fourth Street, a position roughly the same distance from the Inn's patio dining area as the Pro–Bush demonstration, and that in issuing that order, the Agents explained their desire to ensure that no protestors remained in handgun or explosive range of the President. . . . If the Agents' motive in moving Plaintiffs away from the Inn was—contrary to the explanation they provided to state and local police—suppression of Plaintiffs' anti-Bush message, then presumably they would have ensured that demonstrators were moved to an area where the President could not hear their demonstration, or at least to an area farther from the Inn then the position that the pro-Bush demonstrators occupied. Instead, according to the complaint, the Agents simply instructed state and local police to move the anti-Bush protestors to a location situated a comparable distance from the Inn as the other demonstrators, thereby establishing a consistent perimeter around the President. This is not a plausible allegation of disparate treatment.

*Moss,* 572 F.3d at 971.

Taking note of the Ninth Circuit's opinion, Plaintiffs amended their complaint and alleged, "Secret Service Defendants Wood, Savage, and John Doe 1 requested or directed Defendant Towe and the other Police Defendants to clear California Street of all persons between Third and Fourth Streets—that is, the members of Plaintiff Class—and to move them to the east side of Fourth Street and *subsequently to the east side of Fifth Street.*" (SAC ¶ 53 (emphasis added).) Further, they allege the police forcibly moved the anti-Bush group from where they were demonstrating "east along California Street until they had all crossed Fourth Street, and then to the east side of Fifth Street." (SAC ¶ 61.)

> Plaintiffs argue,

> Had that been the true reason [that is, Secret Service did not want anyone within handgun or explosive range of the President] for the request or direction, the Defendant Secret Service agents would have requested or directed that all persons dining, staying at, or visiting the Inn who had not been screened by the Secret Service or the Police Defen-

dants be removed from the Inn. Likewise, had that been the true reason . . . , the Defendant Secret Service agents would have requested or directed that the pro-Bush demonstrators at the corner of Third and California be moved further west so that they would not be in range of the President as he traveled from the Inn to the Honeymoon Cottage where he was staying. . . . Instead, the Defendant Secret Service agents left the pro-Bush demonstrators on the Northwest and Southwest corners of Third and California Streets . . . to cheer for President Bush as he traveled to the Honeymoon Cottage, while causing the anti-Bush demonstrators to be violently moved two blocks east, well out of the President's view. . . . In fact, having moved the anti-Bush demonstrators two blocks east, the Defendant Secret Service agents left the pro-Bush demonstrators with unimpeded access to the President along the route to the Honeymoon Cottage.

(SAC ¶¶ 55–56.)

Federal Defendants argue that Plaintiffs' additional allegations do not impact the Ninth Circuit's conclusion that there is no plausible claim. On the allegation of disparate treatment, Federal Defendants stress that the law requires that the two groups be similarly situated, not identically situated. They argue,

> If the Ninth Circuit could not plausibly infer viewpoint discrimination based on Defendants' alleged request to relocate Plaintiffs to the east side of Fourth Street, then viewpoint discrimination cannot be plausibly inferred based on a new allegation that the dispersal order actually extended a mere block further. Even at Fifth Street, Plaintiffs were still, in the Ninth Circuit's words, in "a position roughly the same distance from the Inn's patio dining area as the Pro–Bush demonstration" and "situated" at a "comparable distance from the Inn as the other demonstrators."

(Fed. Defs.' Mem. 16; citing *Moss*, 572 F.3d at 971.) Federal Defendants argue that this additional allegation does not push the complaint from merely possible to plausible.

While the court agrees that "similarly situated" does not necessarily require the groups to be "identically situated," Plaintiffs have alleged facts that the groups were not similarly situated after the relocation. Both pro- and anti-Bush demonstrators had equal access during the President's arrival and would have had equal access had they not been subject to the security rationale. (SAC ¶ 48.) In fact, after the move, the anti-Bush group was more than twice the distance from the President's hearing range than the pro-Bush group. (Pls.' Mem. in Opp'n 12.) The other supported factual allegations tip the balance to plausible, specifically Plaintiffs' allegation of the falsity of Defendants' security rationale. Plaintiffs allege that "contrary to the assertion of [defendants] there is no line of sight to the patio restaurant from the sidewalks of California Street" and that Federal Defendants "gerrymander[ed] their 'security zone'" to exclude anti-Bush demonstrators. (Pls.' Mem. in Opp'n 6, *citing* SAC ¶¶ 69, 51.)

As to Federal Defendants' argument that the claim is not plausible because Plaintiffs have not alleged that the President was unable to hear their speech from their location, Defendants have not shown that this is dispositive of Plaintiffs' claim. (Fed. Defs.' Mem. 16.) Even so, the Advance Manual supports the alleged motive to move anti-Bush demonstrators from the hearing range of the President. (SAC, Ex. B, 10.) Plaintiffs allege that the agents acted with the impermissible motive to suppress anti-Bush demonstrators' speech.

This can be plausibly alleged without an allegation that their speech was not heard.

### ii. Disparate Treatment as Related to Diners and Guests at Inn

Plaintiffs allege that they were treated differently than the diners and guests at the Inn. They argue that, while the anti-Bush demonstrators were pushed two blocks to Fifth Street, the diners and guests were unaffected even though they were also within handgun or explosive range of the President and had the same amount of notice of the President's decision to dine at the Inn.

Plaintiffs allege that despite this purported risk from all individuals within this proximity, "[d]uring the entire time these actions were being taken against Plaintiffs ... members, the Defendants did not take any action to move the pro-Bush demonstrators or move the unscreened diners, hotel guests, and other visitors, including the assembled medical group, who were inside the Inn." (SAC 162.)

Plaintiffs made a similar allegation in the FAC, but the Ninth Circuit did not find it supportive of a plausible claim. The court distinguished the diners and guests because this combined group was not engaged in expressive activity. Commenting on the allegations of the FAC, the court relied on its decision in *Menotti v. City of Seattle:*

> Again, the crux of Plaintiffs' complaint is that the differential treatment of similarly situated pro-Bush and anti-Bush demonstrators *reveals* that the Agents had an impermissible motive-suppressing Plaintiffs' anti-Bush viewpoint. The differential treatment of diners and guests in the Inn, who did not engage in expressive activity of any kind and were not located in public areas outside the Inn, however, offers little if any support for such an inference. *See Menotti v.*

*City of Seattle,* 409 F.3d 1113, 1130 (9th Cir.2005).

*Moss,* 572 F.3d at 971.

This court, however, respectfully views the crux of the SAC somewhat differently than the Ninth Circuit. Plaintiffs allege that they were treated differently than all other groups who were within explosive or handgun range of the President. As Plaintiffs explained, "[i]t is not that the differential treatment for anti-Bush protestors and the diners and guests at the Inn directly demonstrates viewpoint discrimination. Rather, it is that the differential treatment demonstrates the falsity of the security rationale offered by [Federal Defendants]." (Pls.' Mem. in Opp'n 14.)

Accordingly, the question this court considers is whether the differential treatment of anti-Bush demonstrators compared to all other groups within handgun and explosive range reveals the Federal Defendants had an impermissible motive.

The issue in *Menotti* is distinguishable from the issue here. In *Menotti,* the plaintiffs sued the City of Seattle for violation of their constitutional rights based on an emergency order enacted by the City during the 1999 World Trade Organization (WTO) Conference. 409 F.3d at 1118 (9th Cir.2005). The ordinance was created as a direct result of the violence and unrest of protestors. It was undisputed that the actions of a small group of violent protestors put WTO delegates, police officers, the general public, and other demonstrators at risk. *Id.* at 1122–23. The mayor of Seattle declared a civil emergency on November 30, 1999, and signed the Local Proclamation of Civil Emergency Order Number 3 ("Order No. 3"). The order had the following effect:

> all persons, subject to limited exceptions, were prohibited from entering the portion of downtown Seattle described.... The exceptions to the prohi-

bition on entering the restricted zone were granted for: (1) delegates and personnel authorized by the WTO to participate in official WTO functions; (2) employees and owners of businesses within the restricted area and other personnel necessary to the operation of those businesses; and (3) emergency and public safety personnel.

*Id.* at 1125. Persons could not protest in support of or against any topic within the restricted zone.

The plaintiffs in *Menotti* attacked Order No. 3 as unconstitutional on its face, but the Ninth Circuit disagreed: "[t]he purpose of enacting Order No. 3 had everything to do with the need to restore and maintain civic order, and nothing to do with the content of [Plaintiffs'] message." *Id.* at 1129. It concluded,

> [t]he exemptions permitted shoppers and downtown workers to go about their business in the restricted zone and did not enable the City to discriminate against any persons on the basis of their views. Further, there is no evidence that those persons who were permitted to enter the restricted zone were part of the security problem that prompted the adoption of Order No. 3.

*Id.* at 1120.

In *Moss,* the corollary to Order No. 3 is the Secret Service proposed security rationale that they did not want any person within handgun or explosive range of the President. However, unlike *Menotti,* there was neither violence by any demonstrator nor was there an order of civil emergency.

The threat to the President's security here, as implied by the security rationale, came simply from the *proximity* of persons to the President. In *Menotti,* the threat was created by actual violence. When the shoppers and business owners were exempted from security measures in Seattle, it was because they were not a part of the security problem. 409 F.3d at 1130. The position of the shoppers and business owners is not the same as the position of the diners and guests here. Their proximity to the President makes them a part of the security problem, political views notwithstanding. They received different and, arguably, better treatment than the anti-Bush demonstrators as shown by the fact that they were neither relocated nor screened.

That the diners and guests were not expressing a political view is immaterial to the fact that their proximity made them a potential threat to the President's safety. As Plaintiffs described,

> surely they posed a greater risk of assaulting the President with a handgun or explosive than the anti-Bush demonstrators outside the Inn, separated from and blocked from even seeing the President by the Inn itself and other buildings on California Street.

(Pls.' Mem. in Opp'n 15.)

The court acknowledges and respects the experience and intelligence of the Secret Service and the inherent danger and grave responsibility involved in protecting the President. In no way is this court suggesting that it knows how to do the job of a Secret Service agent. Further, it is not proposing that it knows a better solution for how to protect the President in such a situation.

However, after reviewing the security rationale and its application, the court notes that there were no actions taken to protect the President from potential threats of the diners and guests at the Inn, even though their proximity logically posed a threat to the President, if the court applies the security rationale to everyone and not just the anti-Bush demonstrators. The absence of any measures thus supports Plaintiffs' allegation that the security rationale was false, and this falsity supports Plaintiffs' allegations of improper

purpose and viewpoint discrimination. Plaintiffs have plausibly alleged that they were subject to disparate treatment because of, not merely in spite of, their political views.

### 3. Federal Defendants Do Not Have Qualified Immunity

 Plaintiffs argue that even if they did violate Plaintiffs' constitutional rights, they have qualified immunity. Determining whether government officials are entitled to qualified immunity involves a two-step inquiry. At step 1, the court asks whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the officer's conduct violated a constitutional right. And, at step 2, the court asks whether the right was clearly established in light of the specific context of the case. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). "For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer,* 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (internal quotation marks omitted).

 As previously discussed, Plaintiffs have pled a plausible *Bivens* claim against Federal Defendants. Accordingly, the analysis now moves to step 2. Neither a 42 U.S.C. § 1983 nor a *Bivens* action will hold a supervisor strictly vicariously liable for the actions of his subordinates under a theory of respondeat superior. *Iqbal,* 129 S.Ct. at 1948. Although this question is a part of the substance of § 1983 and *Bivens* liability, it is also a proper component of the qualified immunity inquiry:

> In conducting a qualified immunity analysis …, courts do not merely ask whether, taking the plaintiff's allegations as true, the plaintiff's clearly established rights were violated. Rather, courts must consider as well whether

each defendant's alleged conduct violated the plaintiff's clearly established rights. For instance, an allegation that Defendant A violated a plaintiff's clearly established rights does nothing to overcome Defendant B's assertion of qualified immunity, absent some allegation that Defendant B was responsible for Defendant A's conduct.

*Hope,* 536 U.S. at 751 n. 9, 122 S.Ct. 2508 (Thomas, J., dissenting).

In *Kwai Fun Wong v. United States,* the Ninth Circuit, on interlocutory appeal, dismissed part of a *Bivens* action for failure to state a claim where the complaint "fails to identify what role, if any, each individual defendant had in placing [the plaintiff] in detention." 373 F.3d 952, 966 (9th Cir.2004).

 Further, the Ninth Circuit explained in *al-Kidd v. Ashcroft* that "direct, personal participation is not necessary to establish liability for a constitutional violation." 580 F.3d 949, 965 (9th Cir.2009) (citing *Kwai Fun Wong,* 373 F.3d at 966). Supervisors can be held liable for the actions of their subordinates (1) for setting in motion a series of acts by others, or knowingly refusing to terminate a series of acts by others, which they knew or reasonably should have known would cause others to inflict constitutional injury; (2) for culpable action or inaction in training, supervision, or control of subordinates; (3) for acquiescence in the constitutional deprivation by subordinates; or (4) for conduct that shows a "reckless or callous indifference to the rights of others." *Larez v. City of Los Angeles,* 946 F.2d 630, 646 (9th Cir.1991) (internal citations and quotation omitted). Any one of these bases will suffice to establish the personal involvement of the defendant in the constitutional violation.

Plaintiffs have sued Defendants Wood, Savage, and John Doe 1 in their individual capacities. Plaintiffs allege,

Defendants Tim Wood, Rob Savage, and John Doe 1 at all times material hereto, were Secret Service agents at the scene of the demonstration, acting within the scope of their employment and under color of law, assigned to provide security for the President, and directing, requesting and communicating with the other Defendants in their operations related to the demonstration. Defendants Wood, Savage, and Doe 1 are sued in their official and individual capacities.

(SAC ¶¶ 16–17.) Plaintiffs' first claim for relief states,

The individual Secret Service Defendants, except Defendant Sullivan, are liable in their individual or personal capacities to Plaintiffs and Plaintiff Class ... for compensatory damages under *Bivens v. Six Unknown Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), for the violation of their rights of freedom of speech, assembly, and association under the First Amendment.... [Wood, Savage, and John Doe I] acted willfully and maliciously, or with indifference or reckless disregard of Plaintiff Class members' rights or safety, and Plaintiffs and Plaintiff Class ... are therefore entitled to an award of punitive damages against the individual Secret Service Defendants in their individual capacities, except Defendant Sullivan, in an amount to be established at trial.

(SAC ¶¶ 102–03.)

Plaintiffs claim that Defendants Wood, Savage, and John Doe 1 "requested or directed" the local law enforcement officers to clear California Street between Third and Fourth Streets. (SAC ¶ 53.) They also allege that these Defendants proposed the security rationale that violated Plaintiffs' First Amendment rights for viewpoint discrimination. The Federal Defendants then allowed the pro-Bush demonstrators to remain, undisturbed, to cheer on the President's motorcade while targeting the anti-Bush demonstrators and moving them further from the route. (SAC ¶¶ 56–58, 70.) They also allege that the Secret Service, headed by Defendant Basham,

worked closely with the Advance Team to achieve the goal set out in the Presidential Advance Manual, and to concoct, manipulate, and gerrymander false security rationales for the exclusion or distancing of opposition, dissent, or protest expressive activity from proximity to the President, while minimizing the distancing of the public in general and supporters.

(¶ SAC 69.) Plaintiffs also allege Wood, Savage, and John Doe 1

have promulgated or caused to be promulgated written guidelines, directives, instructions and rules which purport to prohibit Secret Service agents from discriminating between anti-government and pro-government demonstrators, between demonstrators and others engaged in expressive assembly, and between demonstrators and members of the public not engaged in expressive assembly, but these documents do not represent the actual policy and practice of the Secret Service, and are a sham, designed to conceal and immunize from judicial review the actual policy and practice [described herein]. The actions of the Secret Service Defendants during the episode at the Jacksonville Inn on October 14, 2004, were an implementation of this actual policy and practice, which included employing, directing, requesting, or encouraging state and local authorities to assist in implementing the discriminatory policy.

(SAC ¶¶ 71–72.)

Federal Defendants argue that they have qualified immunity because Plaintiffs'

First Amendment rights were not clearly established at the time and the Federal Defendants' conduct on that day was reasonable. (Fed. Defs.' Mem. 15–16.)

In their view, "two public servants made an entirely reasonable and lawful judgment call for the purpose of protecting the President . . . in the challenging context of the President's public appearance at an unfamiliar location." This was an "exceedingly difficult and sensitive task" and "[u]ltimately Defendants saw fit to clear the single block directly in front of the President's location and where Plaintiffs happened to be present." (Fed. Defs.' Mem. 18.) They stress the small window of time in which Federal Defendants had to make a decision and note, "in the unique circumstances confronting them, their commonsense, on-the-spot judgment call was eminently reasonable." (Fed. Defs.' Mem. 19.)

Federal Defendants also strongly advocate for qualified immunity here for the public interests of the qualified immunity doctrine itself. They argue that denying them immunity would have far-reaching effects: "for the court to hold otherwise . . . would run the risk of causing Secret Service agents, generally, to hesitate when in the field with the President over taking a protective action they reasonably believe to be necessary." (Fed. Defs.' Mem. 20.) Rather than considering this incident and its specific context, Federal Defendants ask the court to consider the future impact:

> They ought *not* to be distracted by any concern, that if they take a particular protective action in the field that they reasonably perceive to be necessary (as was the case here), this will mire them in meritless litigation and subject them to potentially disabling threats of liability. But subjecting Defendants Savage and Wood to suit on *these* allegations would pose precisely this risk.

(Fed. Defs.' Mem. 21 (citations omitted).) Further, they argue that if liability were extended here,

> any agent in the field would potentially second-guess himself or herself—and delay any action at all, possibly to the President's detriment—by pausing to wonder if he or she should *also* remove other individuals who might be in or near the general areas of the President but who are not similarly situated to the large crowd.

(Fed. Defs.' Mem. 22.)

Despite Federal Defendants' arguments, the court is not convinced. The court has applied the standards of a Rule 12(b)(6) motion, and Plaintiffs have plausibly alleged that their First Amendment rights were clearly established during their demonstration in Jacksonville, Oregon.

The court construes all the plausible allegations in the light most favorable to Plaintiffs, as the non-moving party. These allegations, at their essence, assert that the anti-Bush demonstrators were exercising their First Amendment right on October 14, 2004, in demonstrating against the President and his policies. Plaintiffs alleged that it was only the anti-Bush demonstrators who were subject to a security rationale and who were dispersed and moved up to two blocks from the President. They allege the pro-Bush demonstrators and guests and diners at the Inn were not subjected to security measures. *See* Part V.A.2(b). Taking these allegations as true, Plaintiffs have asserted they were discriminated against and effectively targeted because of their anti-Bush speech in direct a violation of their First Amendment rights. A reasonable officer would have been aware that targeting and moving this group based solely on their speech, violated their established rights.

Plaintiffs have identified the roles of Wood and Savage played in the actions

that violated the anti-Bush demonstrators' rights on October 14. *See Kwai Fun Wong,* 373 F.3d at 966. Plaintiffs allege they were on the scene in Jacksonville and requested or directed that the pro-Bush demonstrators be moved. They also allege it was their proposed security rationale that discriminated against anti-Bush demonstrators. Plaintiffs have plausibly alleged their conduct violated their rights.

Construing only the plausible allegations in the light most favorable to Plaintiffs, Plaintiffs have alleged there was a *sub rosa* policy in place that limited expressive activity, and Plaintiffs' First Amendment rights. *See* Part V.B.1.b. Plaintiffs have plausibly alleged that their First Amendment rights were clearly established and that the Federal Defendants participated in actions that violated these clearly established rights. Federal Defendants Wood and Savage are not entitled to qualified immunity. The Federal Defendants' motion to dismiss the *Bivens* claim for violation of First Amendment rights should be denied.

### B. State Defendants' Motion to Dismiss the § 1983 First Amendment Claim Is Granted

 The court now considers Plaintiffs' 42 U.S.C. § 1983 claims against State Police Defendants in their individual capacities.

### 1. Plaintiffs Have Not Pled a Plausible § 1983 First Amendment Claim

This court applies the Court's methodological approach in *Ashcroft v. Iqbal,* ── U.S. ────, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009). *See* Part V.B.

 To prevail on a claim for relief under 42 U.S.C. § 1983, Plaintiffs must plausibly plead two elements: "(1) that the Defendants acted under color of state law; and (2) that the Defendants caused them

to be deprived of a right secured by the Constitution and laws of the United States." *Johnson v. Knowles,* 113 F.3d 1114, 1117 (9th Cir.1997). Because State Defendants do not dispute that they acted under color of state law, the issue here is whether Plaintiffs have satisfactorily pled that Rodriguez or Ruecker violated Plaintiffs' federal or constitutional rights.

Plaintiffs have pled that State Defendants Rodriguez and Ruecker, deprived them of their First Amendment constitutional rights through content or viewpoint discrimination. (SAC ¶ 99; Pls.' Mem. in Opp'n 24.) As discussed above, " '[c]ontent discrimination' occurs when the government 'chooses the subjects' that may be [publicly] discussed, while 'viewpoint discrimination' occurs when the government prohibits 'speech by particular speakers,' thereby suppressing a particular view about a subject." *Giebel v. Sylvester,* 244 F.3d 1182, 1188 (9th Cir.2001) (alterations in the original) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 59, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (Brennan, J., dissenting)). Viewpoint discrimination violates an individual's First Amendment rights. *R.A.V. v. City of St. Paul,* 505 U.S. 377, 391, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992).

 To survive State Police Defendants' motion to dismiss, Plaintiffs must plausibly plead that Rodriguez and Ruecker "acted with discriminatory purpose" during their challenged conduct; that is, they engaged in viewpoint or content discrimination because of, not merely in spite of, discriminatory effects on Plaintiffs. *See Iqbal,* 129 S.Ct. at 1948 (internal citations omitted). As previously discussed, "[P]urposeful discrimination requires more than 'intent as volition or intent as awareness of consequences.' It instead involves a decisionmaker's undertaking a course of action because of, not merely in spite of

[the action's] adverse effects upon an identifiable group." *Iqbal*, 129 S.Ct. at 1948 (internal quotations and citations omitted).

Plaintiffs must also plausibly plead personal conduct by Rodriguez and Ruecker that violated Plaintiffs' First Amendment rights. *See al-Kidd v. Ashcroft*, 580 F.3d 949, 964 (9th Cir.2009). Section 1983 will not "hold a supervisor strictly vicariously liable for the actions of his subordinates." *al-Kidd*, 580 F.3d at 964. Yet, "direct, personal participation is not necessary to establish liability for a constitutional violation." "Supervisors can be held liable for the actions of their subordinates (1) for setting in motion a series of acts by others, or knowingly refusing to terminate a series of acts by others, which they knew or reasonably should have known would cause others to inflict constitutional injury; (2) for culpable action or inaction in training, supervision, or control of subordinates; (3) for acquiescence in the constitutional deprivation by subordinates; or (4) for conduct that shows a 'reckless or callous indifference to the rights of others.'" *Id.* at 965 (citing and quoting *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991)).

### a. Conclusory Allegations Are Disregarded

■ "[B]are assertions" that amount to "nothing more than a formulaic recitation of the elements of a constitutional discrimination claim" do not survive a motion to dismiss. *Iqbal*, 129 S.Ct. at 1951 (internal quotation and citation omitted). The opinion in *Iqbal* provides an illustrative analysis of a constitutional discrimination claim that was too conclusory to survive a motion to dismiss.

> [R]espondent plead[ed] that petitioners 'knew of, condoned, and willfully and maliciously agreed to subject [him]' to harsh conditions of confinement 'as a matter of policy, solely on account of [his] religion, race, and/or national origin

and for no legitimate penological interest.'... The complaint alleges that [Petitioner] Ashcroft was the 'principal architect' of this invidious policy ... and that [Petitioner] Mueller was 'instrumental' in adopting and executing it. *Id.* at 1950–51. The Ninth Circuit found that these allegations, without further support, were "bare assertions" that amounted to "nothing more than a formulaic recitation of the elements of a constitutional discrimination claim." *Id.* (internal quotation and citation omitted).

Here, like in *Iqbal* the court should disregard some of Plaintiffs' allegations because they amount only to a "formulaic recitation of the elements of a constitutional discrimination claim;" they are unsupported by allegations of specific culpable actions taken individually by either Rodriguez or Ruecker that violated Plaintiffs' constitutional rights. (*See, e.g.* SAC ¶¶ 96, 99, 109.) First, paragraph 96 does not equal more than a formulaic recitation of elements. It alleges that "the individual State Police Defendants *personally directed and approved* of the actions of the police against Plaintiff Class, and *personally directed and approved* of permitting the pro-Bush demonstrators and unscreened diners, guests, and visitors ... to remain in the vicinity undisturbed and unrestricted." (SAC ¶ 96 (emphasis added).) As Plaintiffs have openly conveyed (*see* Pls.' Mem. in Opp'n 24), Plaintiffs crafted paragraph 96 of the SAC in an attempt to satisfy the requirements of *al-Kidd*, which requires plaintiffs to plead personal conduct by defendants that violated plaintiffs' constitutional rights:

> Defendants Ruecker and Rodriguez are 'liable for the actions of their subordinates (1) for setting in motion a series of acts by others, or knowingly refusing to terminate a series of acts by others, which they knew or reasonably should

have known would cause others to inflict constitutional injury; [and] (2) for culpable action or inaction in training, supervision, or control of subordinates' in connection with the execution of the Secret Service's direction and request to remove the anti-Bush protestors from the vicinity of the Inn.

(Pls.' Mem. in Opp'n 24 (citing *al-Kidd*, 580 F.3d at 965).) Yet, because Plaintiffs fail to support paragraph 96 with any factual content regarding when, how, or from where Rodriguez and Ruecker "personally directed and approved of the various activities that resulted in the alleged discrimination, paragraph 96's allegations are conclusory and the court should disregard them.

Second, the court should not consider Plaintiffs' allegations in paragraphs 99 and 109 of the SAC because there Plaintiffs again only offer recitations of the elements of their First Amendment claim without factual support. In paragraph 99 of the SAC, Plaintiffs conclusorily allege that

> actions against Plaintiff Class in discriminating against them based on the fact, content, and/or viewpoint of their expression ... were the result of improper training, supervision, instruction and discipline of ... the police officers under the personal directions of the State ... Police Defendants By the practice or custom of failing to adequately and properly train, supervise, instruct, or discipline their police officers, the Defendants have directly caused the violations of rights that are the subject of this action.

(SAC ¶ 99.) In paragraph 109 of the SAC, Plaintiffs allege, "The individual Police Defendants ... acted willfully and maliciously, or with indifference or reckless disregard of Plaintiff Class Members' rights or safety." Neither paragraph is supported by factual allegations. Such conclusory allegations fail to state a claim against

Rodriguez or Ruecker on which relief can be granted. *See Iqbal*, 129 S.Ct. at 1951.

**b. Plaintiffs' Remaining Allegations Do Not Plead a Plausible Section 1983 Claim Against Rodriguez or Ruecker**

Plaintiffs do not plead a plausible violation of Plaintiffs' First Amendment rights by Rodriguez or Ruecker, and consequently, the section 1983 claim against those individuals should be dismissed. *See Iqbal*, 129 S.Ct. at 1949; *see* Part III and Part V.A.2.b, *supra*.

■ To survive State Defendants' motion to dismiss, Plaintiffs must plead factual content that plausibly suggests personal conduct based on discriminatory purpose by either Rodriguez or Ruecker. In order "[t]o state a claim based on a violation of a clearly established right [in the context of a First Amendment discrimination claim], respondent must plead sufficient factual matter to show that petitioners adopted and implemented the ... policies at issue not for a neutral ... reason but for the purpose of discriminating...." *Iqbal*, 129 S.Ct. at 1948–49.

Here, Plaintiffs' allegations do not plausibly allege that Rodriguez and Ruecker's conduct was motivated by a discriminatory purpose. First, Plaintiffs' allegations of negligence, which are the primary focus of their allegations in support of their First Amendment claim, are irrelevant for a showing of the requisite discriminatory purpose. Rather than pleading facts that plausibly suggest some discriminatory purpose behind Rodriguez and Ruecker's actions, Plaintiffs allege and give some facts supporting that "the Police Defendants knew or should have known" that the Federal Police Defendants were themselves acting with discriminatory purpose when they requested or directed the State Police Defendants to move Plaintiffs down the

street. (*See* SAC ¶¶ 53–55.)[11] Plaintiffs further assert that "Defendants should not be permitted to hide behind the directions and requests of the Secret Service [to move the anti-Bush demonstrators] as an excuse for blatant viewpoint and content discrimination in violation of the First Amendment." (Pls.' Mem. in Opp'n 24.) These allegations do not support discriminatory intent and are irrelevant to a § 1983 claim.

Second, Plaintiffs' allegations on the whole indicate that the decision to move the anti-Bush demonstrators and not to move or screen other groups or individuals rested solely with the Secret Service, not with State Defendants. (*See, e.g.,* SAC ¶¶ 53–54, 56–59; State Defs.' Mem. in Supp. 12–13.) As State Defendants assert, the allegations against them indicate no purpose on their part other than to carry out the Secret Service's directions. (*See* State Defs.' Mem. in Supp. 12–13.)

Third, Plaintiffs' allegations do not tend to rule out more likely explanations that do not involve a discriminatory purpose for why State Defendants complied with the Secret Service's alleged requests to relocate the anti-Bush demonstrators. (*See* SAC ¶¶ 59–60); *Iqbal,* 129 S.Ct. at 1951 ("[G]iven more likely explanations, [the pleadings] do not plausibly establish this purpose."). Common sense suggests there are other more likely explanations for Rodriguez and Ruecker's choice to follow the Secret Service's requests. *See Iqbal,* 129 S.Ct. at 1950 ("Determining whether a complaint states a plausible claim for relief will … be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.") (internal citation omitted). Arguably,

Rodriguez and Ruecker determined that the Secret Service officers, who have the specialized job to protect the President, had superior knowledge about threats to the President's safety. Few rationale police officers would second-guess a request by the Secret Service for a specific action when there is a presidential security concern. (*See* SAC ¶ 54.) These more likely explanations for the State Defendants' conduct weigh against the plausibility of Plaintiffs' § 1983 First Amendment claim against. *See Twombly,* 550 U.S. at 566–69, 127 S.Ct. 1955 (acknowledging that defendant's parallel conduct was consistent with an unlawful agreement in violation of the Sherman Act, but nevertheless concluding that parallel conduct did not plausibly suggest an illegal agreement because it was not only compatible with, but indeed more likely explained by, lawful, unchoreographed free-market behavior).

Plaintiffs do not plead a plausible First Amendment claim under 42 U.S.C. § 1983 against Rodriguez and Ruecker. The court should grant State Police Defendants' motion and dismiss this claim.

### 2. State Defendants Have Qualified Immunity

Rodriguez and Ruecker are entitled to qualified immunity. For this additional reason, Plaintiffs' § 1983 claim against State Police Defendants in their individual capacities for violations of Plaintiffs' First Amendment rights should be dismissed.

As previously explained, to overcome qualified immunity, Plaintiffs must plead facts that plausibly satisfy both prongs of the qualified immunity analysis: (1) that the officers' conduct violated Plaintiffs' constitutional rights and (2) the con-

---

**11.** State Police Defendants assert that the Secret Service agents told them that the reason for moving the anti-Bush demonstrators down California Street was to prevent anyone from being "within handgun or explosive range of the President." (SAC ¶ 54.) In response, Plaintiffs allege that "the Police Defendants knew or should have known that [this reason] was false." (SAC ¶ 55.)

tours of the right are sufficiently clear such that a reasonable officer would understand he is violating this right. *See Saucier,* 533 U.S. at 201, 121 S.Ct. 2151; *Iqbal,* 129 S.Ct. at 1950; *see* Part V.A.3, *supra.*

As discussed above, Plaintiffs failed to plausibly plead that Rodriguez and Ruecker's personal conduct violated Plaintiffs' First Amendment rights through viewpoint or content discrimination. While the qualified immunity inquiry could end here, *see Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) the court considers for the sake of argument whether Plaintiffs' allegations overcome the second prong of the qualified immunity analysis.

To overcome the second prong of qualified immunity, Plaintiffs must plead facts that plausibly suggest that " '[t]he contours of the right [are] sufficiently clear [so] that a reasonable official would understand that what he is doing violates that right.' " *See Saucier,* 533 U.S. at 202, 121 S.Ct. 2151 (citing *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034); *Iqbal,* 129 S.Ct. at 1950. This clarity depends in part on the state of the law at the time of the challenged conduct. *See Saucier,* 533 U.S. at 202, 121 S.Ct. 2151. If the law were such that it would not be clear to a reasonable officer that his conduct was unlawful, then summary judgment for the defendant based on qualified immunity is appropriate. *Id.* 533 U.S. at 202, 121 S.Ct. 2151 (citing *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (declaring that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law")). In ruling on this issue from the FAC in 2007, this court noted that at the time of State Defendants' challenged conduct in 2004, it was "clearly established" that viewpoint discrimination violates the First Amendment. *Moss v. U.S. Secret Service,* 2007 WL 2915608 at *20 (D.Or., Oct. 7, 2007)

(citing *R.A.V. v. City of St. Paul,* 505 U.S. 377, 391, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (finding that the government cannot regulate speech based upon its content or favor one viewpoint over another)).

The clarity of the constitutional right also depends on whether a reasonable officer could believe that the challenged law enforcement conduct was lawful "in light of ... the information the ... officers possessed" at the time of the challenged conduct. *Anderson,* 483 U.S. at 641, 107 S.Ct. 3034 (1987); *accord Bilida v. McCleod,* 211 F.3d 166, 174 (1st Cir. 2000) (citing *Anderson,* 483 U.S. at 641, 107 S.Ct. 3034, and explaining that, "[a]lthough qualified immunity normally turns on objective circumstances, ... this likely means objective circumstances actually known to the officer" (internal citations omitted)). The court "draw[s] on its judicial experience and common sense" to determine whether Plaintiffs have plausibly alleged that it would have been clear to a reasonable officer in the position of Rodriguez and Ruecker that his conduct was unlawful. *See Iqbal,* 129 S.Ct. at 1950 (internal citation omitted).

Plaintiffs have not shown that it would have been clear to a reasonable officer in Rodriguez and Ruecker's situation that his conduct of moving the anti-Bush demonstrators at the instruction of the Secret Service agents was unlawful. First, the facts alleged do not plausibly suggest that either Rodriguez or Ruecker would have been aware of the differential treatment of the anti-Bush demonstrators as compared to the pro-Bush demonstrators. Respondent does not allege, much less plausibly allege, that either Rodriguez or Ruecker were on location at the time of the alleged injurious activity or knew of and were updated about the details of the relative sizes and locations of the demonstrators, diners, the President, and the nearby al-

leys, or of the relative distances between relevant street blocks, between the President's planned departure route and the various groups, etc. Yet, without factual allegations that plausibly suggest that Rodriguez and Ruecker knew of the differential treatment of the pro- and anti-Bush demonstrators, it is not plausible that it would have been clear to a reasonable officer in Rodriguez or Ruecker's position that his conduct was unconstitutional. The court agrees with Police Defendants on this point. (*See* State Defs.' Mem. in Supp. 17 ("[P]laintiffs do not allege any facts to show that either Superintendent Ruecker or Captain Rodriguez would have been aware of [the] differential treatment, such that they might have known that plaintiffs were subjected to viewpoint (or any) discrimination.").)

Second, even if Rodriguez and Ruecker had been aware of the differential treatment of the pro- and anti-Bush demonstrators, Plaintiffs have not shown that a reasonable police officer could find no legal justification for such differential treatment. *Bilida*, 211 F.3d at 174–175 ("Plausible instructions from a superior or fellow officer support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists (e.g. a warrant, probable cause, exigent circumstances)."); *accord Anderson*, 483 U.S. at 641, 107 S.Ct. 3034.

In *Bilida v. McCleod*, the court concluded that plaintiff "might well have a valid Fourth Amendment claim" where defendant police officers entered plaintiff's home and seized her pet raccoon without a warrant. 211 F.3d 166, 174 (1st Cir.2000) However, the *Bilida* court also concluded that police officers were entitled to qualified immunity because they "had every reason to think that Captain Tyler had secured a warrant or concluded ... that

one was unnecessary" before he directed the defendants to seize the specific raccoon at the specific address. Captain Tyler was defendants' superior officer, and the defendants knew that "the decision [to seize the racoon] had already been made" following a investigation by the police and animal control that same evening. *Id.*

Here, even if a reasonable officer in the position of Rodriguez or Ruecker were fully aware of the details, he would have good reason to believe that his actions in compliance with the Secret Services' orders were legally justified. A reasonable officer could conclude that the Secret Service agents were acting and giving him directions based on knowledge of a specific threat to the President's safety known only to the Secret Service agents. Plaintiffs allege that Secret Service Defendants "requested or directed ... Police Defendants to clear California Street *of all persons* between Third and Fourth Streets," not to clear California Street of all pro-Bush demonstrators between Third and Fourth Streets. (SAC ¶¶ 53–54 (emphasis added).) Furthermore, "the Defendant Secret Service agents told ... the Police Defendants that the reason for the request or direction was that they did not want anyone within handgun or explosive range of the President." (SAC ¶ 54.) Consequently, the Secret Service's instructions to the State Police Defendants would have been plausible instructions from a superior officer that, when viewed objectively, "could lead a reasonable officer to conclude that the necessary legal justification for his actions exists." *Bilida*, 211 F.3d at 174–175.

Third, Plaintiffs do not allege that Rodriguez or Ruecker knew enough about the policy and practice of the Secret Service to discern its alleged actual discriminatory policy from its alleged official policy. Plaintiffs make no allegations to support any allegation that State Defendants had

sufficient knowledge to recognize that the Secret Service's activities, alleged to demonstrate the Secret Service's "Long History and Actual Policy" of discriminating against First Amendment expression (*see* SAC ¶¶ 63–72, 81–84), significantly differed from the "normal, lawful Secret Service security measures during Presidential public appearances or visits … absent … special circumstances suggesting the need for unusual security measures." (*see* SAC ¶ 78.) Consequently, it is not plausible that it would have been clear to a reasonable officer in the place of Rodriguez and Ruecker that his conduct was unlawful where he was following the Secret Service's orders to move all persons though these persons consisted predominantly of anti-Bush demonstrators.

Rodriguez and Ruecker are entitled to qualified immunity. Plaintiffs have not shown that either violated Plaintiffs' First Amendment rights, a requirement under the first prong of *Saucier.* Moreover, they fail to overcome the second prong of qualified immunity. Plaintiffs have not shown that a reasonable officer would have known of the Secret Service agents' differential treatment of the pro- and anti-Bush demonstrators, would have second-guessed the Secret Service's directions and their provided justification, or would have known enough about the Secret Service's policies to alert him to a First Amendment violation here. Consequently, the contours of Plaintiffs' rights would not have been sufficiently clear to alert a reasonable police officer in Rodriguez or Ruecker's position that his conduct was unlawful. Therefore, State Defendants' motion to dismiss Plaintiffs' claim against Rodriguez or Ruecker in their individual capacities

should be granted. *See Anderson,* 483 U.S. at 640, 107 S.Ct. 3034.

## C. City of Jacksonville Defendants' Motion to Dismiss the § 1983 First Amendment Claim Is Granted

City Defendants David Towe and City of Jacksonville move for summary judgment on Plaintiffs' § 1983 claim for violation of First Amendment rights and they also move to dismiss these claims for similar or the same reasons.

Plaintiffs pled similar if not identical claims in their FAC, and City Defendants moved for summary judgment in 2007. On April 22, 2007, the court held the motion for summary judgment in abeyance pending the completion of discovery at the request of Plaintiffs' counsel. (Dkt. No. 103.) The court also stayed the discovery deadline on August 15, 2007. (Dkt. No. 129.)

Because discovery has not yet been completed, the court will not consider City Defendant's motion for summary judgment at this time.[12] However, the court reviews City Defendants' arguments as they relate to a motion to dismiss under Rule 12(b)(6).

As with Plaintiffs' claims against State Defendants, the complaint must plausibly plead that Defendant Towe acted under the color of state law and caused them to be deprived of their First Amendment rights. Plaintiffs allege they were deprived of their rights because of content or viewpoint discrimination. Accordingly, to survive the motion to dismiss, Plaintiffs must plausibly plead that Towe acted with discriminatory purpose during the challenged conduct. *See* Part V.B.I.

---

**12.** When the Federal Defendants sought to appeal this court's denial of their motion for summary judgment, the Ninth Circuit first explained that it did not have jurisdiction over the issue but also commented that were the

appeal to succeed were to succeed, it "would deny Plaintiffs a fair opportunity to litigate the merits of their claim." *Moss,* 572 F.3d at 972.

The City of Jacksonville may be held liable under § 1983 under current case law by what is known as a *Monell* claim. In *Monell v. Department of Social Services of the City of New York*, the Supreme Court explained,

> a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsibly.

436 U.S. 658, 694–95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). To survive the motion to dismiss as to § 1983 claims against the City of Jacksonville, then, Plaintiffs must plausibly allege that their First Amendment rights were violated by way of an official policy, custom or practice of the City of Jacksonville.

Plaintiffs make allegations against the City Defendants that are generally similar to the allegations against the State Defendants. They allege,

> Defendants' Towe, Rodriguez, Wingers and the other individual State and Local Police Defendants personally directed and approved of the actions of the police against [Plaintiffs], and personally directed and approved of permitting the pro-Bush demonstrators and unscreened diners, guests and visitors, . . . inside the Jacksonville Inn to remain in the vicinity undisturbed and unrestricted. The Police Defendants' actions . . . in using overwhelming and excessive force, including the use of officers in riot gear, against unarmed, law-abiding peaceful demonstrators exercising their core First Amendment rights of speech and assembly were the custom, policy, or practice of the State of Oregon and Defendants City of Jacksonville and Jackson County and Municipal Does

> . . . or were established as such by the individual Police Defendants in taking those actions. The individual Police Defendants had the final decision-making authority and responsibility for establishing the policies of their respective employers. The individual Police Defendants' decisions to order and implement the aforesaid police actions constituted the official policy of their respective public employers.

(SAC ¶¶ 96–97). Further they allege the discriminatory actions were the result of

> inadequate and improper training, supervision, instruction and discipline . . . of the police officers under the personal directions of State and Local Police Defendants. Such inadequate and improper training, supervision, instruction and discipline are the custom and practice of Defendants. By the practice or custom of failing to adequately and properly train, supervise, instruct or discipline their police officers, the Defendants have directly caused the violations of rights that are the subject of this action.

(SAC ¶ 99.)

For the same reasons as set forth above, these allegations as they refer to claims for First Amendment violations are no more than conclusory allegations and thus are not considered in the evaluation of the plausibility of Plaintiffs' claims. Allegations that Defendant Towe personally directed and approved of moving the anti-Bush demonstrators and leaving other groups undisturbed are not supported by other factual allegations and amount to formulaic recitations of claim. Any remaining non-conclusory allegations do not plausibly allege that Defendant Towe acted with discriminatory intent. Plaintiffs merely allege that local police officers reasonably followed the Secret Service's request or direction to move the anti-Bush

demonstrators. They have not plausibility alleged discriminatory intent.

Similarly, allegations that it was the custom and practice of the City of Jacksonville that also violated the Plaintiffs' First Amendment rights are also conclusory. Plaintiffs assert that the actions represent the custom and practice of the City of Jacksonville. However, their allegations only display that the custom or practice was to follow the directions of Secret Service officers who were tasked with providing security for the President. Plaintiffs have not alleged that the custom or practice was discriminatory or revealed any discriminatory intent. Plaintiffs have not alleged that any of the City's policies were adopted for a discriminatory purpose, thereby violating Plaintiffs' First Amendment rights. *See Iqbal*, 129 S.Ct. at 1948–49. There is no Monell claim against the City of Jacksonville.

Plaintiffs cannot overcome the City of Jacksonville Defendants' qualified immunity defense for the same reasons that they did not overcome the State Defendants' qualified immunity defense. *See* Part V.B.2. They have not met the first prong to show a violation of constitution rights, and neither can they meet the second prong. Their allegations do not plead facts that their First Amendment rights were sufficiently clear in this circumstance that a reasonable officer following the directions of the Secret Service would know he was violating Plaintiffs' rights. In the context here, in which the President's safety is of imminent concern, it was not unreasonable for an officer to conclude that moving the group of anti-Bush demonstrators' would violate those demonstrators First Amendment rights.

Plaintiffs have not alleged a plausible § 1983 claim for violation of First Amendment rights against City Defendants. The City Defendants' motion should be granted.

## VI. Fourth Amendment Claims

Plaintiffs allege Defendants violated their Fourth Amendment rights in the way in which they relocated anti-Bush demonstrators. They seek relief under *Bivens* against the Federal Defendants and relief under § 1983 against State, County and City Defendants. The 2007 R & R dismissed Plaintiffs' Fourth Amendment *Bivens* claim because "there were no allegations in the complaint supporting that defendants Savage or Wood directed local law enforcement to use excessive force on the demonstrators or unlawfully seize the demonstrators." (2007 R & R 44.) This decision is unchanged.

 To determine whether Plaintiffs have stated a plausible Fourth Amendment claim under § 1983, the court follows the framework outlined by the Supreme Court in *Graham v. Connor. Davis v. City of Las Vegas*, 478 F.3d 1048, 1053–54 (9th Cir.2007). "[A]ll claims that law enforcement officials have used excessive force—deadly or not—in the course of an arrest, investigatory stop or other 'seizure' ... are properly analyzed under the Fourth Amendment and its 'objective reasonableness' standard." *Graham*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). "This analysis 'requires balancing the nature and quality of the intrusion' on the person's liberty with the 'countervailing governmental interests at stake' to determine whether the force used was objectively reasonable under the circumstances." *Davis*, 478 F.3d at 1054 (citing *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir.2005)).

 The court looks to reasonableness at the moment the excessive force occurred. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment. The calculus of reasonableness must embody the allowance for the

fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97, 109 S.Ct. 1865 (internal citations omitted).

■■■■■ The court first assesses the quantum of force used and then measures the governmental interest at stake by evaluating a range of factors. *Davis*, 478 F.3d at 1054. Factors include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Id.* Courts also may consider whether there were other available alternative methods in capturing or subduing the individual. *Id.*

Plaintiffs' allegations of Fourth Amendment violations incorporate State, County, and City Defendants. Plaintiffs explicitly designated the term "Police Defendants" to refer collectively to (1) State Police Defendants Ruecker, McLain, Martz, and Rodriguez and (2) Local Police Defendants of the City of Jacksonville, Jackson County, individual defendants Towe and Winters, John Does 2–20, and the Municipal Doe Defendants.[13] (SAC ¶¶ 29–30.)

State Police Defendants move to dismiss the claim against them for failure to state a claim. The City of Jacksonville Defendants move for summary judgment on

Plaintiffs' Fourth Amendment claims. As previously noted, the court holds the summary judgment motion in abeyance pending the close of discovery. It does consider the City of Jacksonville Defendants' motion under the Rule 12(b)(6) standards.

### A. State Police Defendants' Motion to Dismiss the § 1983 Fourth Amendment Claim Is Denied

State Police Defendants argue that Plaintiffs' claim for Fourth Amendment violations should be dismissed because the SAC does not allege personal conduct of Defendants Ruecker and Rodriguez to meet the pleading requirements for a § 1983 claim under Rule 8 and there is no liability because they have qualified immunity. Plaintiffs have plausibly pled a § 1983 Fourth Amendment claim.

The court analyzes State Defendants' motions under the *Iqbal* standard explained above. Plaintiffs must state a claim that is plausible on its face. A § 1983 claim must allege personal conduct of the named defendants in order to allege liability. (See V.B, *supra*.) While supervisory liability is inapplicable, Plaintiffs may allege Ruecker and Rodriguez are liable for the actions of their subordinates if they plausibly allege one the bases for liability set forth in *al-Kidd*, 580 F.3d at 965 (imposing liability for actions of subordinates "(1) for setting in motion a series of acts by others ... which they knew or reasonably should have known would cause

---

**13.** Section 1983 provides a civil action against persons who violate an individual's constitutional rights. Federal employees sued in their individual capacities may be sued for damages as well as declaratory or injunctive relief. *Hafer v. Melo*, 502 U.S. 21, 31, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). Individuals sued in their official capacities may only be sued for declaratory or injunctive relief. *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Further, a state is not a person for the purposes of this section, but case law, however, treats municipal and local governments as "persons" under the statute and subject to damages and declaratory or injunctive relief. *Monell v. Dept. of Social Services of New York*, 436 U.S. 658, 701, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Because all injunctive relief claims were dismissed in the 2007 R & R, Plaintiffs' remaining Fourth Amendment claims under § 1983 are for damages against Defendants Rodriguez, Ruecker, Towe, Winters, Jackson County, and the City of Jacksonville.

others to inflict constitutional injury; (2) for culpable action or inaction in training, supervision, or control of subordinates; (3) for acquiescence in the constitutional deprivation by subordinates; [and] (4) for conduct that shows a 'reckless or callous indifference to the rights of others'") (internal citations and quotations omitted).

State Defendants move to dismiss, asserting that personal conduct allegations are "virtually nonexistent" and they have qualified immunity. (State Defs.' Mem. in Supp. 20.) The court disagrees. When assuming the non-conclusory factual allegations as true for the purposes of this motion to dismiss, there are sufficient allegations to state a plausible claim.

Plaintiffs allege that State Defendants used unreasonable force in relocating anti-Bush demonstrators who were demonstrating peacefully, lawfully and exercising their protected First Amendment rights. (SAC ¶¶ 45, 59–62.) Their allegations provide context for the events that day and allege that the anti-Bush demonstrators made efforts to cooperate with law enforcement officers and sought to plan and participate in a lawful demonstration.

> Plaintiff Elkovich told Defendants that parents and their young children were expected to participate, that she wanted to avoid any possible problems, and that the demonstration was to be peaceful and law-abiding, with handouts to participants so informing them. Plaintiff Elkovich also emphasized that due to the law-abiding nature of the gathering, riot-geared police would not be necessary and asked that they not be present. Defendant Towe assented to the route and location of the demonstration and said he did not plan to use riot-geared police.

(SAC ¶ 39.)

 Plaintiffs allege, however, that when the State Defendants were instructed to relocate the anti-Bush demonstrators, all Defendants went too far.

> Police Defendants and their police officers, including officers clad in riot gear, forced the anti-Bush demonstrators to move east along California Street, in some cases by violently shoving Plaintiffs ... and striking them with clubs and firing pepper spray bullets at them.... After moving [anti-Bush demonstrators] across Fifth Street, the Police Defendants divided [anti-Bush demonstrators] into two groups, encircling each group and preventing [anti-Bush demonstrators] from leaving the area. Some ... including those with young children, were attempting to leave the area. Several families had become separated, including children; some of whom were lost, frightened and traumatized as a result of the Police Defendants' actions.

(SAC ¶¶ 60–61.)

Further, Plaintiffs allege,

> The Police Defendants' actions and the actions of the police officers in using overwhelming and excessive force, including the use of officers clad in riot gear, against unarmed, law-abiding peaceful demonstrators exercising their core First Amendment rights ... were the custom, policy or practice of the State of Oregon and Defendants City of Jacksonville and Jackson County and Municipal does respectively, or were established as such by the individual Police Defendants in taking those actions. The individual Police Defendants had the final decisionmaking authority and responsibility for establishing the policies of their respective employers. The individual Police Defendants' decisions to order and implement the aforesaid police actions constituted the official policy of their respective public employers.... The Defendants' actions against

Plaintiffs . . . in the use of overwhelming and constitutionally excessive force against them were the result of inadequate and improper training, supervision, instruction and discipline . . . of the police officers under the personal directions of the State and Local Police Defendants. Such inadequate and improper training, supervision, instruction and discipline are the custom and practice of the Defendants. By the practice or custom of failing to adequately and properly train, supervise, instruct or discipline their police officers, the Defendants have directly caused the violations of rights that are the subject of this action.

(SAC ¶¶ 97–99.)

Taking these non-conclusory factual allegations as true, Plaintiffs have plausibly alleged that their Fourth Amendment rights were violated. Assessing the quantum of force and measuring the government interest at stake here, Plaintiffs have alleged that the use of force, namely use of violent shoving, strikes with clubs, and use of pepper spray, was unreasonable.

Undoubtedly, the government interest is high in this case; few would argue that the safety and security of the President should not be of great concern. However, given the specific circumstances here—a peaceful, planned, multi-generation demonstration—Plaintiffs have plausibly alleged the force used to relocate the group went too far.

For instance, Plaintiffs' factual allegations show that the anti-Bush demonstrators did not pose a greater risk to the security of the President as other individuals in the area or to the officers. *See Davis,* 478 F.3d at 1054. In addition, the factual allegations suggest that other methods could have been employed to relocate the group. *See id.* Plaintiffs assert that Police Defendants did not communicate with the demonstration organizers about the need to move the location and Plaintiffs assert that the Police Defendants began moving the demonstrators "[w]ithout attempting to determine whether the assemblage understood the announcements, and without allowing time for the class of about 200 to 300 persons crowded on the sidewalks to move." (SAC ¶ 60.) Considering these allegations under the framework of *Davis* and *Graham* and accepting the factual allegations as true for the purpose of this motion, the court finds the use of force was not reasonable.

State Defendants argue there is no § 1983 claim because Plaintiffs have not alleged personal conduct and are seeking liability through supervisor liability: "it appears to be plaintiffs' view that Rodriguez and Ruecker are liable because they were responsible for the conduct of those they supervised, and not because of any injury or other constitutional deprivation that they personally rendered." (State Defs.' Mem. in Supp. 18.)

The court disagrees. Plaintiffs have alleged sufficient personal conduct to state a claim against the State Police Defendants. As set forth in *al-Kidd,* an official may be held liable for culpable action or inaction in training, supervision, or control of subordinates. 580 F.3d at 965. Plaintiffs have alleged that actions taken against the anti-Bush demonstrators were "overwhelming and constitutionally excessive force" and that they were a "result of inadequate and improper training, supervision, instruction and discipline." It is plausible on the face of the complaint that officers who use excessive force in the circumstances described here have had inadequate training as to what is necessary and appropriate force to relocate peaceful demonstrators.

Allegations also support that State Police Defendants may be held liable for setting into motion a series of acts that they knew or should have known would

result in the use of excessive force. *See id.* Plaintiffs assert that the officers employing the alleged excessive force were under the personal direction of the State Police Defendants. It goes without saying that officers will be taking directions and orders from their superiors. Such directions, including that officers use riot gear on a peaceful group of demonstrators, could plausibly set into motion the course of events that resulted in the injury here. While it may give further support to their claim to have allegations as to training manuals or verbatim instructions, at this stage in the litigation, it is not necessary.

Plaintiffs have plausibly alleged that State Defendants used excessive force to move a group of peaceful demonstrators. Plaintiffs have asserted that officers who forcibly relocated the group were under the direction of the State Defendants. They have plausibly alleged personal conduct of State Police Defendants to be held liable under § 1983.

### 1. State Defendants Do Not Have Qualified Immunity

■■■ State Defendants assert qualified immunity, and they argue that Plaintiffs cannot meet the second prong: "Even under the 'peaceful' circumstances alleged by plaintiffs, these officers reasonably could have believed that the degree of force used was appropriate in carrying out their duties." (State Defs.' Mem. in Supp. 26.) The court disagrees.

Following the steps from *Saucier* outlined in preceding sections, Plaintiffs have met the first prong of the qualified immunity inquiry by plausibly alleging State Defendants' personal conduct violated their Fourth Amendment rights. For the claim to survive, they must further allege that their right to be free of excessive force was sufficiently clear such that a reasonable officer would know that his conduct violates their rights. *See Saucier,* 533 U.S. at 202, 121 S.Ct. 2151.

The court in *Saucier* discussed the definition of "reasonableness" in the second prong of the quality immunity inquiry. "The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct.... An officer might correctly perceive all the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances." *Id.* at 205, 121 S.Ct. 2151. In *Saucier,* the demonstrator alleged that a police officer used excessive force when he grabbed plaintiff, took him to a military van, and pushed or shoved him inside. At the time this occurred, the demonstrator was attempting to hang a banner at a national park where the Vice President of the United States was in attendance. He had hidden the banner from view knowing that it was not permitted and was attempting to display the banner on a barrier that separated the public from a secure area when he was intercepted by police. *Id.* at 206, 121 S.Ct. 2151.

The court concluded, based on the specific circumstances, that the police officer's actions were "within the bounds of appropriate police responses."

> [Police officer] did not know the full extent of the threat [the demonstrator] posed or how many other persons there might be who, in concert with [the demonstrator] posed a threat to the security of the Vice President. There were other potential protestors in the crowd, and at least one other individual was arrested and placed into the van.... It cannot be said there was a clearly established rule that would prohibit using the force [police officer] did to place [the demonstrator] into the van to accomplish these objectives.

*Id.* at 208–09, 121 S.Ct. 2151.

The circumstances here are simply not the same. Here, Plaintiffs communicated

with Police Defendants prior to the demonstration, seeking to inform them of their plans and confirm that the demonstration would be lawful. Plaintiffs identified themselves as demonstrators, notified Police Defendants of their size and intent, and obtained approval for the time, place, and route of their demonstration. (SAC ¶ 39.) Plaintiffs took no affirmative action to threaten the security of the President. The threat they posed was based on their proximity to the President and not on some questionable, potentially threatening action of deliberately approaching a security barrier. (SAC ¶ 54.) Their peaceful demonstration, however was met by police officers who were "forcefully [moving anti-Bush demonstrators] from where they were demonstrating, using clubs, pepper spray bullets, and forceful shoving." (SAC ¶ 61.) After the relocation to Fifth Street, the group was divided and encircled, preventing some from leaving and separating family members, including small children. (SAC ¶ 61.) As alleged and for the purposes of this motion, the circumstances support Plaintiffs and their assertion that a reasonable officer would know such force on this group was unreasonable.

Plaintiffs' have alleged a plausible § 1983 claim for violation of the Fourth Amendment rights against State Police Defendants, and these defendants are not entitled to qualified immunity.

**B. City Defendants' Motion to Dismiss the § 1983 Fourth Amendment Claim Is Denied**

Allegations of City Defendants' actions that violated Plaintiffs' Fourth Amendment rights are nearly identical to allegations of the State Defendant actions. (SAC ¶¶ 96–99.) Plaintiffs seek relief from Defendant Towe under § 1983 for actions taken in his individual capacity. For the same reasons that State Defendants Ruecker and Rodriguez may be held liable for Fourth Amendment violations in their

individual capacities, so may Defendant Towe. Allegations support that Defendant Towe may be held liable for setting into motion a series of acts that they knew or should have known would result in the use of excessive force.

Plaintiffs also seek relief from the Defendant City of Jacksonville under § 1983. As previously explained, a municipality may be held liable under § 1983 if the custom and practice or official policy is alleged to have violated constitutional rights. *Monell,* 436 U.S. at 694–95, 98 S.Ct. 2018; see Part V.C. Liability results when such custom or policy "may fairly be said to represent official policy." *Id.*

■ Plaintiffs have not plausibly stated a *Monell* claim. Though they cite the elements of such a claim in their complaint, allegations are no more than a formulaic recitation and are not entitled to the presumption of truth, under *Iqbal,* 129 S.Ct. at 1951. Barely stating that "the individual Police Defendants' decisions to order and implement the aforesaid police actions constituted the official policy of their respective public employers" is simply not enough. Section 1983 claims against City of Jacksonville, therefore, should be dismissed.

**VII. Claims for Violation of Oregon Constitution**

Plaintiffs' third claim seeks relief from County and City Defendants for violations of rights under the Oregon Constitution. (SAC ¶¶ 112–115.) The court's 2007 R & R dismissed this claim. (2007 R & R 2.) Relying on the Oregon Supreme Court decision *Hunter v. City of Eugene,* 309 Or. 298, 787 P.2d 881 (1990), the court explained that "persons whose rights under Article I, Section 8 of the Oregon Constitution are violated may not bring an action for damages directly under the constitution, but are limited to existing common

law, equitable and statutory remedies." (2007 R & R 36.) The court's previous decision is unchanged, and Plaintiffs' third claim for relief is dismissed.

## VIII. Claims for Oregon Common Law Violations

Plaintiffs' fourth claim seeks relief from City and County defendants for violation of Oregon common law for assault, battery, false imprisonment, and negligence. (SAC ¶¶ 116–18.) City Defendants move for summary judgment on this claim.

Plaintiffs pled similar if not identical claims in their FAC, and City Defendants moved for summary judgment in 2007. On April 22, 2007, the court held the motion for summary judgment in abeyance pending the completion of discovery at the request of Plaintiffs' counsel. (Dkt. No. 103.) The court also stayed the discovery deadline on August 15, 2007. (Dkt. No. 129.)

Plaintiffs' claims for Oregon common law violations are fact-intensive, and entering judgment on these claims without providing the opportunity to complete discovery would be premature and unfair to both parties. The court holds City Defendants' current motion for summary judgment in abeyance, as to claims remaining claims.

## IX. Conclusion

Consistent with the 2007 R & R, all prospective and injunctive relief claims, all Fifth and Fourteenth Amendment claims, claims against Defendant Basham, *Bivens* claim against Federal Defendants for Fourth Amendment violations, and all claims for violation of the Oregon Constitution are dismissed.

Defendants' motions are granted in part, dismissing the following claims:

Against State Defendants: § 1983 claim for violation of Plaintiffs' First Amendment rights against defendant Ruecker and Rodriguez in their individual capacities.

Against City of Jacksonville Defendants: § 1983 claim for violation of Plaintiffs' First Amendment rights against Defendant Towe in his individual capacity and the City of Jacksonville and § 1983 claim for violation of Plaintiffs' Fourth Amendment Rights against City of Jacksonville.

Thus, remaining claims include:

Against Federal Defendants: *Bivens* claim for violation of Plaintiffs' First Amendment rights against defendants Wood and Savage in their individual capacities.

Against State Defendants: § 1983 claims for violation of Plaintiffs' Fourth Amendment rights against defendant Ruecker and Rodriguez in their individual capacities.

Against County Defendants: § 1983 claims for violation of Plaintiffs' First and Fourth Amendment rights and claims for relief under Oregon common law.

Against City Defendants: § 1983 claim for violation of Plaintiffs' Fourth Amendment rights against Defendant Towe in his individual capacity and claims for relief under Oregon common law against Defendant Towe and the City of Jacksonville.

## X. Recommendation

The motions should be granted in part and denied in part.

*This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.* Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order. *Objections to this Report and Recommendation, if any, are due by **August 23, 2010**. If objections are filed, any responses to the objections are due within 17 days, see Federal*

*Rules of Civil Procedure 72 and 6.* Failure to timely file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation.